THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ESTELLA DANIELS, Defendant-Appellant.

Second District No. 2—86—0470

Opinion filed December 31, 1987.—Rehearing denied February 2, 1988.

G. Joseph Weller and Kim M. DeWitt, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of Elgin, and John X. Breslin and Rita Kennedy Mertel, both of State's Attorneys Appellate Prosecutor's Office, of Ottawa, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Estella Daniels, appeals from her conviction of aggravated criminal sexual assault following a bench trial in Winnebago County. (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(b)(1).) The offense was committed against her son, R.G., who was 11 years old at the time of the offense. She received a six-year term of imprisonment.

She contends (1) she was not proved guilty beyond a reasonable doubt; (2) the court erred in admitting and considering irrelevant and highly prejudicial physical evidence; (3) her rights to a fair trial and due process were violated when her attorney was barred from interviewing R.G. and his 10-year-old sister, B.D.; (4) B.D. was not competent to testify; (5) the prosecutor's misconduct prejudiced the trial court's judgment and requires a new trial; (6) she did not receive the effective assistance of counsel; and (7) the sexual assault law is unconstitutional.

The trail of events leading up to the defendant's arrest began on August 27, 1985, when a neighbor, Lori Leng, was told her children were smoking in a cornfield behind her house. When she got to the field, she talked with her children, then examined a grocery bag containing magazines, a notebook and a backpack which belonged to Estella Daniels' son, R.G. Mrs. Leng then telephoned a child abuse agency, and was subsequently contacted by the police. Over defendant's objection, Leng identified the notebook and magazines. Rockford police detective James Thompkins also identified the items in court.

A representative from the Department of Children and Family Services (DCFS) and a Rockford police officer removed R.G. and B.D., the defendant's children, from their home on August 22 and they were placed in a foster home. During the period August 23 to October 11, 1985, the children were interviewed separately by the police, DCFS, and its affiliate, Family Advocate, with varying frequency but initially three to four times per week. Based on information developed during that time period, the defendant and her husband, Vernon Daniels, were arrested on October 12. The defendant was tried separately for the instant offense against her son, R.G.

John Germano, crime scene technician for the Winnebago County sheriff's department, identified two items found in the defendant's home during a search conducted pursuant to warrant: a camera floodlight and an eight-millimeter movie projector found in a hallway closet.

On cross-examination, Germano testified the projector was not tested to see if it worked. An eight-millimeter film was also found but it was not viewed to determine its contents. On redirect examination, Germano described the box cover of the eight-millimeter film as depicting partially nude males and females. On recross, Germano stated that judging by the box cover, the film looked commercially made. Due to the extent of the testimony received concerning the film, the court allowed the State a recess to secure the film, and Germano identified it in court. Holding several frames of the film up to the light, Germano testified he could see a male and female but could not see what they were doing.

B.D., the defendant's 10-year-old daughter, was called to testify for the State. She testified she would be 11 on July 14, 1986, and until a few months prior, she lived at 4339 Brookdale Road in Rockford with her mother, the defendant, and her father, Vernon Daniels. She did not remember the name of the church she attended. She did not know what an oath was, and said that "to tell the truth" means to remember what happened. She did not know what the judge or her

mother would do to her if they found her lying. She named her school and teacher, and said she was in third grade. Her brother, R.G., was 12 and also lived at the Rockford address before they were both placed in the foster home of Rita Tennor.

B.D. testified that in July 1985 she had breakfast with her mother, her father, and her brother, R.G. Afterward, Vernon told them, "We are going to have sexual touching." They all took off their clothes in the living room and she, R.G., and the defendant touched each other's genital areas. Vernon was taking pictures with a black camera about 10 inches wide. At one point, Vernon had to get dressed to go buy more film. When he returned, they all went into her mother's bedroom where her mother told R.G. to put his penis in her vagina. R.G. did so, while Vernon took pictures.

On cross-examination, B.D. stated she was held back in second grade and in kindergarten. She said sexual intercourse was when a person's hands touch another person's vagina. She first heard the words "sexual intercourse" from Assistant State's Attorney Gemignani; she could not remember what he said it meant. She then stated sexual intercourse is the same as sex, and that sex was what it was called when a man puts his penis in a woman's vagina. She denied she ever had sexual intercourse with anybody, or that she ever had sex with her brother, R.G. She did not remember signing a written statement, and she denied having sex with her father or telling anyone that she had. She stated she did have sex with Tim B., however, and clarified her previous denial of sexual relations "with anybody" by stating she meant she never had sexual relations with her family. She denied she had sex with or knew a boy named "Lewis"; she said R.G. knew a boy named Lewis, though. Tim B. lived near her grandmother. She denied ever telling anyone her grandmother was in movies with her, but admitted she told Assistant State's Attorney Gemignani and Lou Gadow (executive director of the DCFS affiliate, Family Advocate) that her grandmother took movies of her. She denied ever telling Gadow that she had sex with her father or her brother. She remembered telling police officer Billy Burgess she had sex with Rodney N., her next door neighbor. It happened one time in his garage in 1984; he put his penis in her vagina and it hurt. She could not describe his penis, how deep he inserted it or how long he kept it in.

She stated she had sexual intercourse with Tim B. more than once but not more than 10 times in his shed. R.G. and Tim's sister were present when she and Tim had intercourse, and Tim also had sex with R.G. on more than one occasion. She saw Tim's penis; it hurt her, and

he did not put it in deep. He was seated and she was sitting on top of him. She did not know what an orgasm was and saw nothing come out of Tim's penis. She denied knowing Lewis or that he touched her in any way or that she had told anyone that. She did not have intercourse with her father, but he touched her vagina externally. She knew what a vibrator looked like but not what it was; she denied that either she or her mother used a vibrator on her. She admitted she told Lou Gadow that R.G. put his penis in her, but stated that she also told her it was not true. She stated the last time she saw R.G. have sexual intercourse with her mother was not in 1986 or 1985, but in 1984. She described R.G.'s penis as looking like "a rabbit's tail."

She stated her father was mean to her; he hit her with a board and gave her two black eyes a long time ago. She loves her mother, and would like to live with her, not Vernon. Her father sold the pictures he took after breakfast to some of his and her mother's friends; she and R.G. were with them at the time. She stated her father also took movies of her and sold them to somebody.

She did not see her mother shoot somebody. Her mother said she had shot somebody in the butt. B.D. said she told her foster mom about this. She denied she knew anyone named Ross and denied telling Lou Gadow that her mother shot and killed a boy named Ross. She and R.G. buried a dog one time, not a person.

She did not recall being examined by a doctor. She admitted she first told Lou Gadow she never had intercourse with anybody, including Tim B., and stated that she did not know why she lied to her.

On redirect examination, B.D. stated that she and her mother were in a movie titled "Mother Daughter Love." She and her mother, her father, and R.G. were in a movie called "Family Touching." Her father decided what movies would be made. She denied either her grandparents or her Aunt Bonnie (Duke) had anything to do with the movies. She denied being in any movies with a whip, or that she or R.G. were ever in a movie with a dog. She stated she made one movie at a place called "the studio." She stated she loves her mother and would go back to live with her if there was no sex.

On re-cross-examination, she denied telling Officer Burgess that her grandpa was the boss who makes the movies. She denied signing defendant's exhibit No. 3 purporting to be the statement she gave to Officer Burgess on October 23, 1985. She did not know who filmed the movie "Family Touching."

On further redirect examination, she stated that "Family Touching" was made at the studio, but she could not recall who was taking the pictures. On further re-cross-examination, she denied any movies

were taken at her Aunt Bonnie's house in Dixon or that she had reported that to Officer Burgess.

On the second day of trial, March 18, 1986, R.G. was called as the State's witness. He testified he was 12 years old. He identified his mother in court, and stated Vernon Daniels was his stepfather. He was presently living with foster parents, Rita and Carl Tennor, and before that lived at 4339 Brookdale Road in Rockford in Winnebago County, Illinois. He lived there with his mother, stepfather, and sister, B.D. He was in fourth grade when he was living at that address. He stated he knew the difference between a lie and the truth and that to take an oath meant to tell the truth. He did not know what the judge would do to him if he didn't tell the truth. He attends a Lutheran church now, but before that he went to Kishwaukee Baptist Church. He testified that on a morning in mid-July 1985 he, his mother, his stepfather, and sister made a movie in which they all took their clothes off and threw them out of the "set"; they were in the living room. After a while, his stepfather had to leave to get some new film. When his stepfather returned, he, his mother and sister played with each other and, at his mother's and stepfather's suggestion, he put his penis in his mother's vagina. He was on top; his stepfather operated the camera.

He stated he had been in four or five movies; one of them was made at a different house in Ogle County. He stated he thought the films were sold to some people named Virginia and Glen. He saw his father carry some movies in a bag into Virginia and Glen's house and when he came out, he had no bag and he was putting money in his pocket.

R.G. stated he began participating in sexual activities with his mother when he was eight years old. He described sexual contact which occurred between himself, his stepfather, and his sister, and between his sister and his stepfather. He stated his stepfather made his sister and him play with their dog's penis while their mother operated the camera.

He identified People's exhibits Nos. 1A through 1H as "Playboy" magazines and his personal notebook, with captioned drawings of nude males and females, a cow and a pig. (Note: Only People's exhibit No. 1D was a Playboy magazine; three of the magazines had a male homosexual theme and two others were Playboy-type magazines.) He testified that he got the idea for the drawings in his notebook from comics, magazines, and his mother and stepfather.

On cross-examination, R.G. testified he was now in fifth grade and that he was held back in third grade. He testified that he discov-

ered from his aunt in July 1985 that Vernon Daniels was not his real father, but his stepfather. He testified he hates Vernon, that he told his mother he wanted her to divorce him, and that he was mad at her for not doing so.

R.G. didn't tell anyone about the fact he was having sex with his mother because he was too scared to tell anybody and he felt guilty. He said he had sex—intercourse—with his sister, B.D.; intercourse meant a boy putting his penis into a girl's vagina. He said it would be a lie if B.D. denied ever having sexual intercourse with him. R.G. testified his parents showed him how to have sexual intercourse by doing it in front of him. He was about nine years old when he first had sex with B.D. He didn't know if his penis went all the way in; they had intercourse "a few" times. He saw his stepfather's penis touch B.D.'s vagina, but he didn't know if it went in. No one told him not to say Vernon went inside B.D.; he had to say it because he had to get his behavior problems straightened out. Before he and his sister went into foster care, his parents told him not to tell anyone about what had happened because he and his sister would get in trouble. He was scared then, but he was not as scared now. He admitted he lied about some sexual things; he said that it didn't happen and it did. He did not know how many times Vernon and B.D. had sex; he had intercourse with his mother a lot of times.

R.G. testified B.D. had sex with Tim B. more than 10 times, and that he saw Tim put his penis in B.D. Tim was sitting in a chair and B.D. sat on top of him. Tim's penis did not go in her vagina; "it was in her rear." R.G. said he also had anal sexual contact with Tim B. a lot of times the previous summer. R.G. said it hurt, but sort of felt good, also.

R.G. said B.D. had sexual intercourse a lot the previous summer in the field with a boy younger than him named Louie who lives in Mississippi now. R.G. said it would not be true if B.D. stated she never had sexual intercourse with Louie. R.G. testified Rodney N. lived next door; Rodney is old enough to drive a car. Rodney N. had sexual intercourse with B.D. in his garage when R.G. was nine years old; Rodney did not have a lot of intercourse with B.D.

R.G. thought the movies made of himself, B.D. and his parents were at Virginia and Glen Higgins' [sic—Hagen's] house. They are eight-millimeter films on a little round reel. R.G. said his grandparents were not in the movies, and were not present when the movies of him were made. He admitted he lied to police and Lou Gadow when he told him his grandparents were the bosses of the movies being made. He lied because he was young, and "it was scary for him to

do all of this." He just wanted to tell them his grandparents were involved. He also admitted he lied about some other neighbor kids being involved in the movies, too, because he did not like those people. He was trying to get those people in trouble, but he wasn't trying to get his mom and stepfather in trouble.

R.G. admitted that sometimes he lied on purpose to the people questioning him. He lied about seeing his mother kill a person named Ross and putting Ross in a bag, then in a trunk, and burying him. He admitted he brought the police to the place where he thought the body was buried. That was a lie, but his mother did say that she killed somebody; he just didn't have enough evidence to prove that she did. The story he told the police was his way of trying to make it true. He told the story about the burial to Assistant State's Attorney Gemignani; R.G. didn't know whether Gemignani believed him or not because R.G. had told lies before. R.G. said he gets punished for telling lies but tells them anyway because it is sort of fun to tell lies, but sometimes it is not.

On redirect examination, R.G. stated he does not say something just because it is what he thinks someone wants him to say. R.G. admitted he initially told a story that his mom wanted him to kill someone but later placed the blame for the killing only on himself. The reason he gave for killing the man was that he was scared. He said his mom told B.D. and him several times that she killed a person out her window in her room, but he did not see it happen.

The sexual activity with Tim B. took place in Tim's old shed, which is near R.G.'s grandmother's house. He did not know if he bled after he had anal intercourse with Tim, but he sometimes bleeds now after a bowel movement. R.G. did not actually see Vernon put his penis in B.D.'s vagina, but he saw them in position, moving. R.G. stated he had sex with Vernon and his mother before he found out that Vernon was not his natural father. R.G. stated he hates his mother in a way, and that he doesn't hate her in a way. He would like to go home and live with her if she gets' her sexual problems straightened out. R.G. stated he felt he had sexual problems, too.

On further re–cross-examination, R.G. stated he never lived with or knew a boy named Ross, but that he read it in a story. R.G. admitted he told Lou Gadow and Mark Morrison (of Family Advocate) that if they didn't leave him alone, he wouldn't say the things they wanted him to say.

R.G. stated that after he was placed in foster care, he was examined by Dr. Miller. R.G. did not tell the doctor that he was having rectal bleeding problems; however, the doctor examined him in that area.

R.G. recalled the day after he was taken from his home and placed in foster care an emergency room physician also examined his rectal area.

R.G. stated his mother did not help him draw the pictures included in his notebook, but that he got ideas for the drawings from his parents, books and magazines.

On further redirect examination, R.G. stated he found the magazines under his parents' bed. R.G. stated the pictures in the book showed oral sex, and that he had had oral sex with his mother and his mother performed oral sex on him. R.G. stated they had a disc player at home and that he had seen "Porky's" and "The Godfather," but he had not seen any movies showing something like what was in the magazines. R.G. said the things he stated in court were not lies but were the truth.

On further re–cross-examination, R.G. stated he found one or two of the magazines in garbage cans, and that his stepfather tells them they can have them. He drew the pictures in the notebook early one morning before anyone was up. R.G. accurately defined oral sex between two males, two females, and a man and a woman. R.G. stated he knew what masturbation was and that he learned it out of a book. He knew what sperm was, but it had never happened to him. R.G. stated he was on top when he had sex with his mother, and that his penis went inside his mother's vagina. R.G. said he saw sperm come out of Tim B.'s penis when Tim masturbated in front of him and B.D. R.G. stated women and girls have the same opening, but that a little girl does not have hair. When R.G. had sex with B.D. his penis did not go all the way in, but it did when he had sex with his mother.

On further redirect examination, R.G. stated he never saw Vernon's sperm. He did see his mother in her room using a vibrator, a type of plug-in play penis; he did not participate in any way at that time.

On further re–cross-examination, R.G. admitted he told "Chris up the street" that B.D. used a vibrator, but that he was just joking around when he said that. He also admitted he told someone he transferred the films to discs and that he told the police the discs had Mexican names, but neither statement was true. R.G. stated it was not true that his mother sold the discs for a lot of money, but that it was true she sold movies for money to Virginia Hagen.

On further redirect examination, R.G. stated he found the three homosexual magazines in his stepfather's room.

The State moved admission of a paper bag and its contents, the magazines and notebook, People's exhibits Nos. 1, and 1A through

1H. The court granted the motion. The defendant objected to the admission of People's exhibit No. 2, the movie floodlight, but the court admitted it in view of the testimony as to several movies having been made. Defendant also objected to admission of People's exhibit No. 3, the movie projector; the court admitted it since the film in question was testified to as being eight-millimeter film. Defendant further objected to People's exhibit No. 4, which was the eight-millimeter film found in the hallway closet. The prosecutor argued the exhibit corroborated the children's testimony of a world permeated with sexual matters. The court admitted the film for the limited purpose that the film corroborated R.G.'s testimony that he obtained other such objects, specifically the magazines, by finding them under his stepfather's bed. The State then rested, and the defendant's motion for a directed finding was denied.

Dr. Charles DeHaan, the emergency medicine specialist who examined R.G. and B.D. after they were removed from the Daniels' home, had testified for the defense out of order during the State's case in chief. Dr. DeHaan stated that he examined R.G. and B.D. on August 23, 1985, at Swedish American Hospital. In examining R.G., DeHaan found no evidence of trauma in the genital or rectal areas. R.G. informed DeHaan that he had not had any sexual contact with anyone. DeHaan also testified that a visual inspection of B.D.'s hymenal ring showed it to be intact, not torn. DeHaan stated that if an object larger than the hymenal ring had passed through it, the ring would tear and heal irregularly, leaving scar tissue. B.D.'s rectal area was also normal. When questioned by Dr. DeHaan regarding any sexual touching or abuse, B.D. denied such activity.

Lou Gadow, executive director of Family Advocate, was called as a witness for the defense. She testified she met with R.G. and B.D. on August 23, 1985, and met with them frequently initially thereafter. She stated she did not ask R.G. about sexual contact with his mother; he spontaneously denied having sex with his mother. R.G. described his mother to her as being a "good mother." R.G. told Gadow the neighbors were trying to cause trouble for his stepfather, but later stated his stepfather was disliked by the neighbors because he gets "mad and mean."

R.G. told Gadow he told the police that he had had sex with B.D., and he also admitted to Gadow that he had had sex with B.D. B.D. also reported to Gadow that she and R.G. had had sex and that she had acknowledged this to the police. Gadow stated R.G.'s description of having sex was oral-genital contact, and B.D.'s description was genital contact. B.D. used the words "in" and "on" the vagina inter-

changeably when referring to the position of the penis. Gadow stated B.D. denied having sex with her mother or father, but did indicate some type of sexual contact with Louie, Tim B. and Rodney N. With regard to Vernon, B.D. did not use the word "intercourse," but talked about "touching," again, interchangeably using the prepositions "in" and "on." R.G. first talked with Gadow about sexual contact with his mother in October 1985.

Gadow stated R.G.'s foster parents contacted her after R.G. reported to them that his mother had killed someone. Gadow was called because R.G. was upset, and she went to see him to provide support. Gadow testified she had trouble determining when R.G. was telling the truth and when he was not. Gadow testified sodium amytal, "truth serum," was considered as a treatment tool due to concern as to whether or not R.G. was recalling what was true; it was her understanding the police were considering a polygraph. Hypnosis was also considered in terms of trying to determine what R.G.'s real treatment need was. The use of hypnosis and sodium amytal would have been used to help determine what it was that was traumatizing R.G. Although R.G. had trouble relating what was true and what was not, Gadow felt he knew the difference between truth and fantasy.

On cross-examination, Gadow testified R.G. was examined by a clinical psychologist in September 1985, and by a psychiatrist in February 1986 due to anxiety he was experiencing with regard to his saying he had lied and his concern about being sent home. He had been experiencing increasing nightmares and had anxiety about his mixed feelings toward his mother. The evaluation was to determine R.G.'s current mental status and his ability to clearly differentiate. R.G. was crying more than usual just before he went to the psychiatrist. R.G. stated he was crying because of his guilt and feeling bad about what he had done wrong and about his fear of being returned home. Gadow stated she believed R.G. as to certain of the things he said.

Gadow testified she first became familiar with the case after R.G. made some statements to another child about sexual contact between himself, his mother, father, sister and a dog. When confronted by DCFS, R.G. denied the activity. Both children initially denied any sexual activity with their parents, and R.G. expressed concern about his stepfather being placed in jail. R.G. initially stated that people who were talking about his stepfather hated his stepfather and were lying about him. R.G. also stated to Gadow that his understanding was that if moms or dads have sex of some kind with their kids, the kids never see their moms again. R.G. reported to Gadow that his mother and stepfather were good parents and that his stepfather never whipped

them. R.G. also explained that the redness and swelling around B.D.'s eyes was due to poison ivy and not any beating by her father. R.G. vehemently denied having any sexual contact with anyone during the interview Gadow had with him on August 23, 1985.

On redirect examination, Gadow stated she did not believe what R.G. told her in that first interview. Gadow stated R.G.'s parents were arrested on October 12, the day after R.G. made the statements that he had sexual contact with his mother and stepfather. Prior to that time, he had admitted sexual activity with other persons and awareness of sexual activity of his mother, but not with him. Gadow stated that getting R.G. to admit sexual contact with his mother was not one of her predetermined goals.

On re–cross-examination, Gadow stated she believed R.G. would try to tell the truth if he was under oath.

Billy Burgess, juvenile detective sergeant with the Winnebago County sheriff's department, testified next for the defense. He interviewed R.G. on August 23, 1985; R.G. denied having sexual contact with his parents, but admitted sexual contact with B.D. After B.D. was separately interviewed by a female officer, B.D. denied to Burgess that she had any sexual contact with her parents but told him about sexual contact with R.G., consistent with what R.G. had told him. B.D. told him about her sexual contact with other people. R.G. and B.D. were later interviewed on August 30 regarding an Ogle County case involving sexual activity with Rodney N., but there was no agreement in the dates of the incident reported by the children. The children denied sexual contact with their parents on that date as well. Burgess believed there was some kind of sexual contact between Rodney N. and the children; he did not believe B.D., however, when she said she had not had any sexual contact with her parents. The children's parents were arrested after R.G. made a statement on October 11, regarding sexual contact with them.

Burgess testified no films or video discs featuring either the parents or the children were found during the search of the Daniels' house, nor were any records of sales or shipments of film or video recordings found. A similar search warrant issued for the Duke home in Franklin Grove yielded nothing, as well. The warrant was issued based on information given by R.G.

Burgess testified he did not believe R.G.'s story about a murder, but obliged R.G. by going to the alleged burial site in a cornfield. Over objection by the State, Burgess testified there was discussion at times about the use of truth serum, a polygraph or hypnosis for the purpose of determining the veracity of R.G.'s story about the murder.

Burgess testified he had difficulty in determining whether R.G. was telling the truth because the story changed a couple of times. R.G. recanted the murder story and the story about some other people, with whom he was angry, being in the movies.

On cross-examination, Burgess stated that late in October, the police developed information that the day after the children were removed from their home, two people observed a pickup truck being used to move things from the home. In his affidavit for a search warrant for the Duke home, it was alleged that after the pickup truck left the Daniels' home, people had seen things from a pickup truck being loaded into the Duke home in Franklin Grove. As far as Burgess knew, the case against Rodney N. was not pursued since it happened about three or four years ago, and a date for the incident could not be established. Burgess testified a polygraph test was unable to be administered to R.G. because the boy was "too hyper." Over defendant's objection, Burgess agreed with Assistant State's Attorney Gemignani that he (Gemignani) had previously told him the reason truth serum could not be administered to R.G. was that DCFS, as the boy's guardian, would not permit it.

Burgess identified People's exhibit No. 6, a three-page written statement taken from R.G. on October 11, 1985, which generally contained the things R.G. told Burgess about the sexual abuse, and, over defendant's objection, it was admitted in evidence.

On redirect examination, Burgess identified Defendant's exhibit No. 3A, a signed carbon original of the statement he took from B.D. Burgess did not know why B.D. would have denied seeing, signing, or reading the statement. Both R.G.'s and B.D.'s statements were a combination of Burgess' words and their own. Burgess acknowledged that the children had given numerous definitions of what sexual intercourse was, and they may have referred to it as being touching of the vagina with the finger. Burgess admitted that People's exhibit No. 6, R.G.'s statement, did not use the term "penetration."

Virginia Hagen was next called to testify for the defendant. She and her husband, Glen, lived at 317 McLean. She has known the defendant since 1955 and R.G. and B.D. since their births. In May 1985, the defendant gave her a permanent and did her hair for her in June. She saw the Danielses on July 4 and, subsequent to that time, the defendant and the children would come over to her house; the children would swim and the defendant would do Hagen's hair. She denied she ever purchased any films of any sort from the defendant or her husband, but stated that they sometimes exchanged Atari video games such as PacMan and bowling. She paid the defendant for

her beautician services. Hagen testified the defendant's reputation for truthfulness has been good. On cross-examination, Hagen admitted she had been convicted of deceptive practices involving stealing $900 from the government and was then on probation.

The defendant then testified. She graduated from high school under a special education program and has a beautician's license. During the summer of 1985, she was doing hair once in a while, and Vernon was a janitor at the YMCA. She explained the badly damaged magazines were in her house under the bed, and that she tried to burn them but that Vernon stopped her. She did not know where some of the magazines came from; she looked at the magazines but had not read them. She did not know the children had access to the magazines. She had never seen R.G.'s drawings before seeing them in court. The defendant denied she had any sexual contact with R.G., or that she allowed B.D. or R.G. to touch her in a sexual manner. She stated that in the months leading up to her arrest, Vernon's relationship with her and her children was troubled and argumentative. She observed Vernon scold the children and use a foot-long ruler to discipline them. She testified the projector found in the house belongs to Vernon; the reels on it have not been working right. One reel was fixed, but the other had to be finger-wound. Movies cannot be made with the projector; she only knows how to use it to run off films such as her husband's vacations in 1968. The projector has not been used during the past few years, and was stored in the hallway closet. The attic is used for the storage of seasonal items such as Christmas trees, summer and winter clothing. She didn't know anything about the floodlight, did not know how to use it, and had not seen it used by Vernon; it also was stored in the hallway closet.

She never heard of a place called "the studio" other than the place they went to have their family portraits taken. She and the children visited her parents in Adeline, Illinois, in Ogle County quite a few times in 1985. She stated she knew what a vibrator was, and that Vernon ordered "some stuff through one of these stores like a dirty store." She never used it; there were no other similar devices in her house, and she never purchased anything like a dildo or a rubber penis.

Prior to the date the children were taken away, she had no knowledge of any sexual contact between her son and daughter and anyone else. She was allowed to see the children until she was arrested, and then was prohibited from seeing the children as a condition of her bond. To her knowledge, defense counsel was not allowed to see the children either. She denied she ever rented or sold any movies, films or recordings, except they occasionally rented children's-type video

movies like the "Never-Ending Story."

She acknowledged Vernon had a criminal record for "messing around with his daughter." She and Vernon were married at the time he was arrested, charged and convicted. At that time, the defendant questioned B.D. and R.G. as to whether Vernon had ever touched their "private parts." The children denied any sexual contact, so the defendant dropped the subject. The defendant's parents also questioned B.D. and R.G. as to whether Vernon had sexually assaulted them. These questions were met with denials.

The defendant stated that approximately five years ago, she saw a "peeping Tom" outside her window. She pointed a BB gun out her bedroom window, shot it, and heard the prowler say "ouch." She did not tell the children, who were asleep, about the incident. The prowler did not die, nor was a body ever buried. The defendant stated she did not discuss the facts of life with her children because she didn't think they were old enough to know anything like that. She also stated she did not discuss masturbation with them, since she did not know what masturbation was.

On cross-examination, the defendant stated she remained married to Vernon even after he pleaded guilty to indecent liberties with his daughter, because she just couldn't believe it. She never discussed with her children what their "private parts" were before she asked them whether Vernon had "messed" with them. The defendant stated the truck seen at the house the day after the children were taken away was hauling away things to the Salvation Army box in Forreston. She had cleaned the things out so that the kids' rooms would be clean when they got back. She stated when she shot the prowler he said, "Ouch, you shot me in the butt." The defendant stated she only knew of one vibrator in her house. When shown People's exhibits Nos. 7 and 8, two plastic penis-shaped articles, the defendant identified the smaller of the two which she kept in her room but never used. She admitted she denied there were any dildos in her house, but then identified People's exhibit No. 9, a piece of plastic in the shape of a phallus, which she testified was a gag prize from her sister. Defendant stated she did not know the meaning of the word masturbation until her son testified. She took the Salvation Army items to Forreston instead of Rockford because she was staying in Forreston at her sister's. She denied either she or Vernon drove the pickup truck to Franklin Grove and emptied the contents at Bonnie and Ray Duke's house. Based on the children's testimony, she stated she did not disbelieve that Vernon had abused them sexually.

On redirect examination, the defendant stated she went alone to

stay with her sister in Forreston because she could not stand being at home. The defendant and the People stipulated that People's exhibits Nos. 7, 8 and 9 were found in the defendant's home during the execution of the search warrant.

Susan Roberts testified in rebuttal for the State. She testified that she lived across the street from the defendant. The day after she was told the children were taken from the Daniels' home, she saw two people in an open-bed pickup truck parked next to a bedroom window in the house. She saw blankets, knapsacks and shovels being loaded into the truck. She could not identify the persons, but stated that there was one male and one female, both between the ages of 25 and 35. She did not see the Daniels' car at the house or the defendant. On cross-examination, Roberts testified that she could not identify any other items that were placed in the truck. Upon redirect examination, Roberts stated that neither of the two people she saw was Estella or Vernon Daniels.

Following argument, the court found the defendant guilty of the offense as charged.

The defendant contends she was not proved guilty beyond a reasonable doubt of aggravated criminal sexual assault. She asserts the State's evidence was thoroughly incredible where its primary witness, R.G., was an admitted and repeated liar whose testimony was uncorroborated in any way by that of his confused, incompetent sister. We disagree.

■ When presented with a challenge to the sufficiency of the evidence, it is not the function of a reviewing court to retry the defendant. (*People v. Powell* (1987), 160 Ill. App. 3d 689, 693.) "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *** Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins* (1985), 106 Ill. 2d 237, 261.

In order to prove the defendant guilty of aggravated criminal sexual assault the State had to prove beyond a reasonable doubt that the accused was over the age of 17 and committed an act of sexual penetration with a victim who was under 13 years of age when the act was committed. (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(b)(1).) The

defendant does not dispute that she was over 17 or that R.G. was under 13. "Sexual penetration" is defined as:

"[A]ny contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including, but not limited to cunnilingus, fellatio or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(f).)

The information charged the defendant knowingly committed an act of sexual penetration with R.G. in early July 1985 in that R.G. "inserted his penis into [the defendant's] vagina." The defendant argues R.G. could not be believed considering the many lies he admitted he told the police, the DCFS, and Family Advocate.

"Accusations that a person has committed sexual offenses of the type charged against [the] defendant have been described as being 'easily made, hard to prove, and harder to be defended by the party accused.' [Citation.]" (*People v. Taylor* (1987), 153 Ill. App. 3d 710, 712.) Accordingly, the rule has been established that a conviction for aggravated criminal sexual assault or abuse, where the defendant denies the charges, will be upheld where there is either some corroboration of the testimony of the complaining witness by some other evidence, fact, or circumstance in the case, or the testimony of the complaining witness is otherwise clear and convincing. (*People v. Server* (1986), 148 Ill. App. 3d 888, 891; *People v. Powell* (1985), 138 Ill. App. 3d 150, 156.) It is not necessary that the testimony of the complaining witness be uncontradicted or unimpeached or crystal clear and perfect in order to be deemed clear and convincing. (*People v. Nelson* (1986), 148 Ill. App. 3d 811, 821; *People v. Powell* (1985), 138 Ill. App. 3d 150, 156.) Any shortcomings in the victim's testimony do not destroy the victim's credibility, but merely go to the weight to be afforded the testimony by the trier of fact. (*People v. Hutson* (1987), 153 Ill. App. 3d 1073, 1076.) The credibility of the complaining witness is a question for the trier of fact, and its determination is entitled to great weight. (*People v. Server* (1986), 148 Ill. App. 3d 888, 894-95; *People v. Powell* (1985), 138 Ill. App. 3d 150.) Evidentiary matters which may corroborate the victim's testimony include an eyewitness account. (*People v. Server* (1986), 148 Ill. App. 3d 888, 895.) A reviewing court may not substitute its judgment for that of the trier of fact on questions involving weight of the evidence or credibility of witnesses, and may not reverse criminal convictions unless the evidence

is so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of guilt. *People v. Morgan* (1986), 112 Ill. 2d 111; *People v. Nelson* (1986), 148 Ill. App. 3d 811.

■ We find that R.G.'s testimony alone, although not entirely unconvincing, was not of the "clear and convincing" character necessary to sustain the defendant's conviction. Corroborated as it was, however, by that of his sister, we believe the State sustained its burden of proof. The fact R.G. admitted deliberately lying on various occasions was a matter properly considered by the trial court in determining whether R.G. was a credible witness. Although the court found R.G.'s testimony to be truthful, its finding clearly showed it also relied on B.D.'s testimony in adjudging the defendant guilty of the offense.

Although there were some obvious reasons why R.G. would have lied in the beginning about not having had sexual contact with his mother (*i.e.*, he was told by his mother that he and his sister would get in trouble and his belief that he would never see his mother again if he admitted such contact), his numerous admitted instances of lying for either a vindictive or no stated reason at all regarding other persons' involvements in the movie making—including his grandparents—cannot help but cast a pall over that which he offered as the truth. Accordingly, B.D.'s corroborative testimony was necessary to the defendant's conviction, and we find it was sufficiently corroborative of R.G.'s testimony to permit affirmance of the court's judgment.

The defendant argues that B.D. was incompetent to testify and, even if she was competent, neither her testimony nor the physical items presented to the court corroborated R.G.'s charge against the defendant. Although we agree that the items in question (the magazines, notebook, vibrators, dildo, movie projector, film and light) did not specifically corroborate R.G.'s testimony concerning the instant offense, we do find B.D. was competent, and that her eyewitness testimony specifically corroborated that of R.G.

■ In view of counsel's failure to raise the issue of B.D.'s competency at trial and, anticipating the rule that the competency of a child witness cannot be raised for the first time on appeal (*People v. Tappin* (1963), 28 Ill. 2d 95), the defendant asks we review B.D.'s competency under the plain-error doctrine. (107 Ill. 2d R. 615(a).) We do so in view of the obvious significance of B.D.'s testimony (*People v. Brown* (1980), 91 Ill. App. 3d 163; *People v. Sykes* (1977), 45 Ill. App. 3d 674), and in view of the defendant's further allegation that her counsel was ineffective for failing, *inter alia*, to object to B.D.'s competency.

The general rules regarding the competency of a child witness

were recently set forth in *People v. Epps* (1986), 143 Ill. App. 3d 636, 639:

"[T]he controlling factor that determines a youngster's ability to testify is the degree of a child's intelligence, rather than mere chronological age. A child may testify if he is sufficiently mature to receive correct impressions by means of his senses, to recollect and narrate intelligently, and to appreciate the moral duty to articulate the truth. [Citations.] A court of review will not reverse the trial court's decision to allow a child to testify unless the lower court abused its discretion [citation], or unless it is clear that the court misapprehended a legal principle [citation]."

■ The recent trend, recognized in our *In re A.M.C.* (1986), 148 Ill. App. 3d 775, 778, is toward an extremely broad standard of competency in which trial courts' decisions permitting very young children to testify (ages 5, 5½, 6 and 7) have been upheld. B.D. turned 10 the month of the offense charged, and she was 10 at the time of trial. Based on her responses to counsel's initial questions, and her subsequent testimony during trial as detailed above, we conclude there was no abuse of the court's discretion in permitting B.D. to testify. Despite the fact she did not know what an "oath" was, she knew that "to tell the truth" meant to tell what happened. The fact she did not know what the judge or her mother would do to her if she lied does not mean that she did not know it was wrong to lie; simply, that she did not know what they would do to her if she did. Also, contrary to the defendant's assertion, there is no evidence B.D. lied on the stand and then did not "know why"; the record reference provided referred to the fact B.D., prior to trial, had denied to Lou Gadow that she had sexual intercourse with Tim B. or anybody else. Admitting that was untrue, B.D. stated she did not know why she lied to Gadow, and she was not questioned further on that point. We conclude B.D. was a competent witness.

That resolved, we consider whether B.D.'s trial testimony was sufficiently corroborative of R.G.'s testimony to sustain the defendant's conviction. We find that it was.

Despite the discrepancy in B.D.'s testimony that the last time she saw R.G. and the defendant having sex was in 1984 rather than in 1985, and its inconsistency with R.G.'s testimony as to the room in which the offense occurred (the bedroom as opposed to the living room), B.D.'s testimony corroborated the essential details and sequence of the offense as related by R.G. They both testified it was in the morning; the "sexual touching" began in the living room; all four

of them were naked; at one point Vernon left to buy film; after he returned, R.G. put his penis in his mother's vagina.

Although the defendant suggests R.G. was motivated to lie about her because of his then-recent discovery that Vernon was not his natural father, no motive to lie about the defendant on B.D.'s part is apparent. Moreover, although the defendant argues B.D.'s testimony was inconsistent with R.G.'s testimony concerning those persons with whom B.D. allegedly had intercourse, we find those inconsistencies outweighed by the numerous striking consistencies between B.D.'s and R.G.'s testimony. For instance, their testimony was consistent as to the essential details of their sexual relationship with Tim B., including the fact the sex took place in Tim's shed, Tim was in a sitting position and B.D. was sitting on top of him, and that Tim had anal intercourse with R.G. Notably, also, in view of Dr. DeHaan's testimony that B.D.'s hymenal ring was intact, R.G. testified Tim had his penis in B.D.'s "rear." Although B.D. stated Tim had vaginal intercourse with her, in her statement to Burgess she stated Tim put his penis "in my front and back but not very long." B.D. denied she had sex with her father or R.G., whose penis she described looked like "a rabbit's tail", or with "Lewis" (Louie) whom R.G. said was younger than him. B.D. testified she only had sex with Rodney N. once about two years earlier in his garage. R.G. testified Rodney had intercourse with B.D. in Rodney's garage when R.G. was nine years old, and Rodney did not have a lot of intercourse with B.D. R.G. also testified he did not actually see Vernon put his penis in B.D.'s vagina. Further, R.G. testified he was nine when he first had sex with B.D., he did not know if his penis went all the way in, and they had intercourse "a few" times. Although he knew what sperm was, he had not personally experienced it. Dr. DeHaan testified the hymen does not completely span the opening to the vagina, and he never measured B.D.'s hymenal opening. He stated an object smaller than the opening or one that was soft would not have torn the hymen, although an adult erect male penis should damage the hymenal ring.

Viewing this evidence in the light most favorable to the prosecution, it appears B.D.'s hymenal ring may have been intact for exactly the reasons cited by Dr. DeHaan, or because B.D. had been penetrated rectally rather than vaginally.

We find B.D.'s corroborative eyewitness testimony clearly distinguishes the instant cause from the cases cited by the defendant in which the convictions were reversed on reasonable doubt grounds. (*People v. Morgan* (1977), 69 Ill. 2d 200; *People v. Kolden* (1962), 25 Ill. 2d 327; *People v. Mathis* (1985), 133 Ill. App. 3d 1027; *People v.*

*Higgins* (1979), 71 Ill. App. 3d 683.) Accordingly, we find the defendant was proved guilty of the offense beyond a reasonable doubt.

The defendant next contends she was deprived of her right to a fair trial when irrelevant and highly prejudicial materials were "paraded" before the trial court. Specifically, she complains of the admission in evidence of sexually explicit magazines and R.G.'s notebook, the movie projector, the eight-millimeter film and the floodlight. Although not admitted in evidence, she also complains of the two vibrators and the dildo which were introduced in court. She urges we apply the plain-error doctrine in reaching the merits of the issue with regard to the magazine and notebook inasmuch as defendant withdrew her objection thereto at trial. She cites *People v. Malkiewicz* (1980), 86 Ill. App. 3d 417, in support of her plain-error argument.

The State asserts the defendant waived any error in the admission of the magazines and notebook by her failure to object at trial. (*People v. Reynolds* (1983), 116 Ill. App. 3d 328.) Further, it contends the defendant opened the door to evidence of the eight-millimeter film and acquiesced in the presentation of the vibrators and dildo by stipulating that the items were found in her home. Assuming, *arguendo*, no waiver occurred, the State contends no error occurred in the admission of the magazines and notebook as they were necessary to explain why R.G. was questioned by the authorities about sexual activities, and to explain R.G.'s familiarity with sexual terms and items. The projector and floodlight corroborated the children's testimony concerning the movies taken of them, and the eight-millimeter film was admitted for the limited purpose of corroborating R.G.'s testimony that he found other such objects (the magazines) under his stepfather's bed. The presentation of the vibrators and dildo, if error, was invited by the defendant. Further assuming, *arguendo*, it was error for the court to admit in evidence or view these items, the State asserts it was harmless error in light of the eyewitness testimony of R.G. and B.D.

■ The test to determine the admissibility of evidence is whether it fairly tends to prove the particular offense charged; whether that which is offered as evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable, *i.e.*, whether it is "relevant." (*People v. Ward* (1984), 101 Ill. 2d 443.) Evidence is relevant where there is a sufficient nexus between it, the defendant, and the crime. (*People v. Clark* (1987), 160 Ill. App. 3d 877, 888-89; *People v. Veal* (1986), 149 Ill. App. 3d 619.) Evidence is relevant when it tends to prove a disputed fact or to render the matter in issue more or less probable in light of logic, experience and

accepted assumptions of human behavior. *People v. Vella* (1985), 133 Ill. App. 3d 104.

 █ Although the court and the People are under a duty to avoid the introduction of evidence the prejudicial effect which outweighs its relevance (*People v. Jones* (1982), 94 Ill. 2d 275), relevant, admissible evidence need not be excluded simply because it tends to prejudice the accused; the trial court must weigh the relevance of the evidence against its prejudicial effect on the defendant. (*People v. Wright* (1986), 140 Ill. App. 3d 576.) The court's determination to admit evidence or not will not be reversed absent an abuse of discretion to the prejudice of the defendant. (*People v. Lester* (1986), 145 Ill. App. 3d 720, 735.) A defendant may waive the issue of the improper admission of evidence on appeal by failing to object to it during trial (*People v. Johnston* (1987), 160 Ill. App. 3d 536), or by procuring, inviting or acquiescing in the admission of the evidence, even though it is improper. (*People v. Stewart* (1984), 105 Ill. 2d 22; *People v. Payne* (1983), 98 Ill. 2d 45; *People v. Pegram* (1987), 152 Ill. App. 3d 656.) An issue thusly waived may be reviewed under the plain-error doctrine (107 Ill. 2d R. 615(a)), however, where the evidence is closely balanced or where the error is of such magnitude that the accused is denied a fair trial. *People v. Bosworth* (1987), 160 Ill. App. 3d 714, 717.

 Defendant does not argue the plain-error rule should be employed to preserve the issue of the improper introduction of the vibrators and dildo, or the admission of the eight-millimeter film, and we find she waived any error in regard to those items. A defendant cannot stipulate to the introduction of evidence, as she did here with the vibrators and dildo, and then complain on appeal the introduction was error. (*People v. Ross* (1978), 63 Ill. App. 3d 884, 889.) Defendant argues she did not acquiesce in the admission of the eight-millimeter film, however, because she was merely trying to rebut the inference that she had made films of her children. Defendant's cross-examination of the State's witness regarding whether any pornographic films as specified in the search warrant were found, however, "opened the door" to the State's inquiry on redirect examination concerning the pornographic film found, and the defendant may not now complain about that which she invited. *People v. Pegram* (1987), 152 Ill. App. 3d 656.

 As to the magazines and R.G.'s notebook, we decline to apply the plain-error rule as urged by the defendant based on *People v. Malkiewicz* (1980), 86 Ill. App. 3d 417. In *Malkiewicz*, we examined under the plain-error rule the admission of testimony concerning four

suggestively titled books found in the car of the defendant, who was charged with rape, deviate sexual assault and armed violence. We found the testimony, which related to the titles of the books, was prejudicial and harmful error where the prosecution failed to show the books belonged to the defendant, when or if he had read the books, or what the contents of the books were. Thus, the books there had no relevance or materiality to the crime charged, nor to the defendant's state of mind.

*Malkiewicz* was a jury trial, as opposed to the bench trial here. The evidence in *Malkiewicz* was ambiguous and the question of whether force amounting to rape was used turned on the jury's assessment of the credibility of the victim versus that of the defendant. R.G.'s testimony here, however, was fully corroborated by the eyewitness account of his sister, B.D. Also, unlike the books in *Malkiewicz*, there was no doubt about the contents of the magazines, and R.G. testified he got the ideas for the drawings in his notebook from his parents, books and magazines. Moreover, we find these items relevant to the issue of the defendant's intent and credibility in light of her admission that she knew of the presence in her home of some of the magazines but not their content, while at the same time explaining she tried to burn them.

 Defendant did object to the admission of the floodlight and the eight-millimeter projector; however, we find no abuse of the court's discretion in their admission. R.G. and B.D. both testified to the filming of the offense with a black camera about 10 inches wide, and to the fact that they had each been in four or five other movies. R.G. testified he thought the movies taken of him, B.D. and his parents were on a little round reel. As such, the fact eight-millimeter movie equipment, albeit not the camera itself, was found in the house, tended to corroborate the testimony of the children and made it more probable that the offense occurred as the children described it. *Cf. People v. Allison* (1983), 115 Ill. App. 3d 1038 (where the court did not err in admitting nine books and magazines seized from the indecent liberties-charged defendant's trailer since they corroborated the complainant's testimony).

Accordingly, we conclude that defendant was not deprived of a fair trial by the introduction and admission of these items.

 The defendant next contends she was deprived of a fair trial and her right to confrontation was seriously jeopardized when the court denied her pretrial motion requesting that "she and her counsel be granted reasonable access to the children of the defendant who may be called as witnesses in this cause." It was alleged in the mo-

tion that the children had been taken from the home of the defendant through juvenile proceedings, and that it was a condition of the defendant's bond that she have no contact with the children. It was further alleged that neither she nor her counsel knew the residence of the children and that it "would be necessary for the defendant and her counsel to communicate with the children in preparation for the trial."

At the hearing, the assistant State's Attorney stated the children were presently in the care and custody of DCFS, and that the State would object to giving out the addresses of the children which addresses, in fact, the State normally does not even know since, when it needs to contact children thusly placed, it contacts DCFS and the children are brought to them. After the hearing, the court ordered the defendant be supplied with any statements made by the children with regard to the defendant, but otherwise denied her motion.

Defendant contends her counsel was forced to construct his cross-examination from only the written statements which the children made to the police on one date, and from their testimony on direct examination. She further contends that, at the least, defense counsel should have been allowed to interview them, and that the need for pretrial interviews was apparent in view of the lies told by both children and their contradictory statements given to the police and juvenile authorities. She cites *People v. Butler* (1974), 23 Ill. App. 3d 108, in support of her contention that the court's refusal to grant her and her counsel pretrial access to the children amounted to an abuse of discretion with constitutional ramifications warranting reversal and new trial. We find no reversal is warranted.

As the State points out, it was suggested by the State at the hearing that the children would be made available to defense counsel upon his request for same. Contrary to the defendant's assertion in reply, we believe the court's denial of defendant's motion—which was framed in terms of defendant *and* counsel being afforded reasonable access to the children—did not amount to a denial of access to the children by defense counsel alone, particularly in view of the State's explicit suggestion that that procedure would be possible. The record does not show that defense counsel ever availed himself of that opportunity. We find this aspect of the instant cause distinguishes it from *People v. Butler* (1974), 23 Ill. App. 3d 108, where the trial court's indecision in the overruling of defense counsel's objection at trial to the testimony of the State's principal witness resulted in the denial of an opportunity for defense counsel to interview the witness prior to his testimony. Defense counsel had tried to interview the witness the

afternoon prior to trial, but he was impeded by the sheriff's office. The court's overruling of defendant's objection at trial amounted to condonation of the denial of access to the witness which further frustrated the meager representation the reviewing court found defendant had received.

The record here refutes defendant's further contention that counsel only had access to the written statements made by the children to the police on one date. It shows counsel had records of Lou Gadow's interviews with the children through December 1985, and that other of her records for January, February and March 1986 were never turned over to the State's Attorney's office. Gadow herself was called as a defense witness at trial, and defense counsel vigorously cross-examined both children concerning their prior inconsistent statements to police and Gadow. Accordingly, we find no basis for reversal as to this issue.

■■■ ■ Defendant contends Assistant State's Attorney Gemignani exceeded the bounds of permissible trial advocacy when he introduced several items of irrelevant, highly prejudicial material, furnished testimony to a witness, and interjected the prior conviction of her husband for indecent liberties, all in an effort to paint a picture of sexual immorality and prove her guilty of the offense charged.

Specifically, defendant asserts the prosecutor's introduction of the dildo and vibrator, the eight-millimeter film and movie projector, and the magazines, all of which defendant alleges were irrelevant and prejudicial to her, amount to the type of prosecutorial misconduct condemned in *People v. Liapis* (1972), 3 Ill. App. 3d 864, and *People v. Scaggs* (1982), 111 Ill. App. 3d 633. We disagree.

The question of the relevance and/or the defendant's waiver of her objection to these items has been discussed above, and will not be repeated. As such, the fact these items also tended to create the impression the defendant was an immoral person does not retroactively render them inadmissible. All effective evidence is prejudicial in the sense of damaging the party against whom it is offered. "[T]he prejudice that calls for exclusion is given a more specialized meaning: an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror." (E. Cleary & M. Graham, Handbook of Illinois Evidence §403.1, at 148 (4th ed. 1984).) Unlike the *Liapis* and *Scaggs* cases, the evidence here did have a tendency to prove the issue being tried. (*People v. Liapis* (1972), 3 Ill. App. 3d 864, 868.) In contrast, in *Liapis*, the defendant was charged with arson and the prosecutor continually attempted to introduce evidence of the defendant's pending divorce and his possible

running around with women, none of which evidence had any bearing on the fire. (*People v. Liapis* (1972), 3 Ill. App. 3d 864, 868.) In *Scaggs*, the prosecutor's embarkation on a line of questioning regarding the fact that defendant was living with a woman other than his wife was found to be error where such evidence had no bearing on the offenses as charged against the defendant, aggravated battery, attempted murder and armed violence. Accordingly, we find no misconduct on the prosecutor's part in introducing this evidence.

Defendant next argues the prosecutor distorted the evidence during closing argument with regard to her lack of knowledge of the magazines and her denial that she had a dildo in her home. The record shows the defendant failed to object to any of these comments at trial and, thus, she has waived her objection. *People v. Hall* (1986), 114 Ill. 2d 376, *cert. denied* (1987), 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618.

The defendant also did not object during trial to the prosecutor's assertedly improper cross-examination of her concerning her husband's prior conviction for indecent liberties, and does not argue plain error. Accordingly, this issue is also waived. (*People v. Hudson* (1983), 113 Ill. App. 3d 1041.) Moreover, as the State points out, the topic of the defendant's husband's prior conviction was introduced during her direct testimony, and she was subject to legitimate to cross-examination concerning it (*People v. Burris* (1971), 49 Ill. 2d 98), particularly in this case, where the children testified to Vernon's participation in the instant offense, and where she herself admitted on cross-examination she did not disbelieve the children concerning his sexual abuse of them.

██ Defendant's last assertion in this regard is that the prosecutor overstepped the bounds of proper cross-examination when he furnished Officer Burgess with the answer to a question after Burgess could not recollect why the prosecutor was "not pleased" with having truth serum administered to R.G. The prosecutor then inquired: "Isn't it true I told you you had to get permission of the Department of Children and Family Services because they were the guardian?" The court sustained the defendant's objection to the question; however, defendant contends Burgess subsequently "parroted" the prosecutor's version of their prior conversation, and she analogizes the error to a violation of the witness-advocate rule. That rule has been described as articulating "the professional impropriety of assuming the dual role of advocate and witness in a single proceeding." *People v. Janes* (1985), 138 Ill. App. 3d 558, 567, citing *United States v. Johnston* (7th Cir. 1982), 690 F.2d 638, 642; see also 107 Ill. 2d R. 5—102.

Although we agree the prosecutor's inquiry was improper, the court sustained defendant's objection to it, and the same information was otherwise properly received by virtue of the prosecutor's more extended line of questioning which probed Burgess' own knowledge on the matter of whether he could have administered the serum to R.G. without the permission of the DCFS and the boy's guardian.

As such, the error was harmless, particularly where Burgess' testimony otherwise indicated the truth serum, hypnosis and polygraph were being considered in connection with verifying R.G.'s statements regarding the alleged murder and not the offense with which the defendant was charged.

Defendant next contends she was deprived of her right to the effective assistance of counsel. In order to prevail on such a claim:

> "[D]efendant must show that counsel committed errors so serious that, judged by an objective standard, counsel's performance was incompetent and that the errors, in fact, were prejudicial to his defense. [Citations.] A defendant is entitled to competent, not perfect, representation [citations], and errors in judgment of trial strategy do not establish incompetency of counsel [citations]." (*People v. Ortiz* (1987), 155 Ill. App. 3d 786, 794-95.)

In making the determination that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068), a court must consider the totality of the evidence before the judge or jury. *People v. Wilson* (1986), 149 Ill. App. 3d 1075, 1077-78.

Defendant urges it was error for her counsel to fail to renew his initial objection to the introduction of the magazines and R.G.'s notebook, and that he should have made a motion *in limine* to preclude not only those items but also the projector, floodlight, film, dildo and vibrators. She also charges counsel was incompetent for failing to challenge B.D.'s competency.

It has been held that incompetence of counsel is not established by a failure to object to evidence, even if the evidence is inadmissible. (*People v. Murphy* (1978), 72 Ill. 2d 421, 438.) The decision of when to object to evidence is purely a matter of trial strategy. (*People v. Stokes* (1981), 95 Ill. App. 3d 62, 69.) Appellate review of a defendant's representation does not extend to matters involving trial tactics. *People v. Clark* (1987), 160 Ill. App. 3d 877, 883-84.

As such, counsel's decision to renew his objection to the magazines and R.G.'s notebook are not subject to our review. Further, as

the State points out, a motion *in limine* would have been unnecessary in any case inasmuch as this was a bench trial, and a trial judge is presumed to ignore any improper evidence. (*People v. Robinson* (1964), 30 Ill. 2d 437.) We do not find the instant cause analogous to *People v. Harter* (1972), 4 Ill. App. 3d 772, relied upon by defendant, wherein counsel was found ineffective for failing to move to suppress certain checks found on the defendant after his arrest. The evidence in that case was otherwise inconclusive without the improperly admitted evidence. Here, however, we have found above that the evidence was not improperly admitted, and that the evidence was not otherwise inconclusive where R.G.'s testimony concerning the offense was corroborated by B.D.'s eyewitness testimony.

The fact that counsel did not challenge B.D.'s competency was a matter of trial tactics to which a review of counsel's representation does not extend. *People v. Howard* (1979), 74 Ill. App. 3d 138, relied on by defendant, is not supportive of her position on this issue. In *Howard,* the court found counsel incompetent for failing to investigate and discover the medical records of the defendant's commitment to a mental hospital which was related to her competency for purposes of fitness and a possible defense at trial.

In the instant cause, counsel did not fail to investigate or discover anything with regard to B.D.'s testimony that would prejudice the outcome of the defendant's case. As the State suggests, it may have been counsel's considered judgment that B.D.'s testimony would be inconsistent with that of R.G. and that she would be subject to impeachment. Moreover, in light of our finding above that B.D. was competent, it appears a challenge by counsel would have been unavailing.

■ Defendant also asserts counsel rendered her ineffective assistance by failing to understand what conduct constituted actual penetration within the meaning of the aggravated criminal sexual assault statute. (Ill. Rev. Stat. 1985, ch. 38, pars. 12–12(f), 12–14(b)(1).) She argues his misunderstanding significantly diminished the impact of his argument to the court in which he tried to show the fabrication of R.G.'s testimony:

> "Mr. Gemignani can maybe get up and scream and yell that this hymen was touched and puched [*sic*] but never punctured because nobody ever penetrated, they just rubbed and touched but yet when it comes to Estella Daniels there is no question there is penetration, coincidentally by coincidence that just happens to be the statutory requirement penetration with an adult 17 with a child less than 13. Everything else was touching and

pushing but when it came to Estella there is absolutely no question there is penetration."

Although we agree counsel's argument makes it appear he misunderstood the present statutory definition of "sexual penetration," which is much broader than its former and commonly understood meaning (*People v. Hope* (1986), 142 Ill. App. 3d 171, 174-75), counsel's argument must also be viewed in light of the information filed against the defendant which charged that she "performed an act of sexual penetration with [R.G.] in that he inserted his penis into her vagina." The State's evidence proved beyond a reasonable doubt that R.G. placed his penis in his mother's vagina, and the court entered a judgment of conviction of the crime of aggravated criminal sexual assault "as set forth in the Information." As such, we do not believe the point of counsel's argument necessarily was lost on the trial judge; the evidence simply showed the State proved the elements of the offense charged against the defendant as set forth in the information.

Inasmuch as it is axiomatic that arguments of counsel are not considered to be evidence, and there is no reasonable probability that the outcome of the trial would have been different but for counsel's error, *People v. Rainey* (1986), 149 Ill. App. 3d 327, and *People v. Wilson* (1986), 149 Ill. App. 3d 1075, cited by the defendant, are inapposite. In *Rainey*, the defendant was found to have received ineffective assistance of counsel where counsel's failure to interject a defense of insanity until the sentencing hearing affected the court's judgment and was prejudicial since the court would have found the defendant guilty but mentally ill *if* such evidence had been presented. (*Rainey*, 149 Ill. App. 3d at 330-31.) In *Wilson*, counsel was found to have been ineffective when his failure to use the victim's—the sole eyewitness'—prior inconsistent statements as substantive evidence, rather than for impeachment only, resulted in depriving the accused of explaining an essential element of her defense and refusal of an instruction on the lesser offense of reckless conduct. *Wilson*, 149 Ill. App. 3d at 1077-79.

Defendant also asserts counsel was ineffective for failing to challenge the constitutionality of the aggravated sexual assault statute. However, as discussed below, defendant has waived the issue of the constitutionality of the statute and the cases she relies on in support of her argument have been decided contrary to her position. Moreover, in *People v. Ortiz* (1987), 155 Ill. App. 3d 786, 790-91, where the court found the aggravated criminal sexual assault statute and its related provisions were not violative of due process, it also found defense counsel did not act incompetently in failing to challenge

it. *People v. Ortiz* (1987), 155 Ill. App. 3d 786, 795.

We conclude defendant was not deprived of the effective assistance of counsel. The record shows counsel filed pretrial motions for additional discovery and for severance from Vernon's case, interposed objections to questions by the prosecutor and to the admission of items of evidence, thoroughly cross-examined the State's witnesses and presented evidence on the defendant's behalf.

Defendant's final contention is that sections 12—12 through 12—18 of the Criminal Code of 1961 (referred to by her as the Criminal Sexual Assault Law) (Ill. Rev. Stat. 1985, ch. 38, pars. 12—12 through 12—18) is unconstitutional. She contends the Criminal Sexual Assault Law is so unreasonable in its definitions and applications as to deny anyone prosecuted under it the due process of law guaranteed by both the Federal and State Constitutions.

■ For the reasons expressed in *People v. Treece* (1987), 159 Ill. App. 3d 397, 414-15, we conclude the defendant's argument raises no substantial question of constitutionality where the same arguments have been raised in other cases and rejected, and, thus, she may be deemed to have waived the issue of the constitutionality of the statute by failing to raise it below. Moreover, we note that the cases consolidated in *People v. Haywood*, upon which cases defendant relies, have been reversed, upholding the constitutionality of sections 12—13(a)(1) and 12—14(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, pars. 12—13(a)(1), 12—14(a)(2)). *People v. Haywood* (1987), 118 Ill. 2d 263.

For the reasons set forth above, the judgment of the circuit court of Winnebago County is affirmed.

Judgment affirmed.

LINDBERG, P.J., and INGLIS, J., concur.