THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES GUNARTT, Defendant-Appellant.

First District (1st Division)   No. 1—88—3565

Opinion filed August 19, 1991.

Ryan, Miller & Trafelet, P.C., of Chicago (Irving Miller and Mary Ellen Dienes, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Gunta Z. Hadac, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Defendant Charles Gunartt was charged with aggravated criminal sexual assault, criminal sexual assault and aggravated criminal sexual abuse.

After a bench trial, defendant was found guilty, all counts were merged and the trial court entered judgment against defendant on the aggravated criminal sexual assault charge. Defendant was sentenced to eight years' imprisonment. Defendant appeals his conviction, alleging that (1) the trial court erred in denying his motion for a new trial, (2) he was denied effective assistance of counsel, and (3) prejudicial error was committed by the prosecution which denied him a fair trial.

On July 9, 1987, Dorothy Russell, a/k/a Dorothy Cook, and her two children, L.C. and C.C., went to defendant's home located at 1926 North Lawndale in Chicago. L.C., defendant's and Russell's 10-year-old daughter, was wearing, among other clothing, a dress and stockings. Defendant is the father of L.C. but is not C.C.'s father. L.C. testified that she had not seen her father in "a long time." This testimony was corroborated by defendant, who claimed he had not seen Russell or L.C. for four years, although he did speak with Russell on the telephone occasionally.

Russell and the children entered the apartment and both children began to watch television in the front room. The apartment consists of 3½ rooms, a front room, a kitchen, a bedroom off the kitchen and a bathroom. There is disputed testimony as to whether Russell and her children went across the street to a liquor store and made a purchase. Nonetheless, there is overwhelming testimony that Russell had alcohol on her breath and that she was acting in a drunken and disorderly manner on that date.

L.C. testified that defendant was standing in the rear of the apartment when he asked her if she wanted a pop. L.C. responded yes, and defendant told her that she would have to come to the kitchen and get the pop herself. C.C. then asked whether he could also have a pop. Defendant told C.C. that he could not. When L.C. got to the kitchen, defendant told her to go to the bedroom and L.C. obeyed. L.C. testified that defendant locked the door. L.C. stated that defendant tore her stockings and told her to pull down her underwear. L.C. did as she was told. Defendant then pulled down his pants and underwear. L.C. testified that defendant "put his private part inside" her vagina for about one minute. L.C. cried and told defendant to get off her. L.C. next noticed her brother standing at the bedroom door.

L.C. went out of the bedroom to her mother, who was in the front room. Russell asked defendant, "What did you do to my baby?" Russell told L.C. to call the police, but defendant would not let her use the telephone. Defendant went to the kitchen, obtained a knife and stabbed Russell in the foot. Then defendant's girl friend came into the apartment and struck Russell. Russell and the children left the apartment. Russell and her children went to the Jehovah's Witnesses across the street and called the police. Russell, however, saw a police car and went out into the street and waved it down. Russell and her children were taken to Mount Sinai Hospital. L.C. stayed there for several days.

C.C.'s testimony substantially corroborates L.C.'s story. C.C. testified that he went to the kitchen to get some water and heard his sister crying. C.C. went to the bedroom door, which he testified was ajar, and opened it. C.C. saw L.C. standing by the door with her stockings around her ankles and noticed that they were torn.

Police officer Ohse testified that at approximately 8 p.m. on July 9, 1987, Russell flagged down him and his partner. Ohse testified that Russell had been "struck a few times and was bleeding in some places." Russell claimed to have had a fight with defendant. Ohse smelled alcohol on Russell's breath. Ohse took Russell and her children to Mount Sinai Hospital, where Russell and L.C. received treatment. Russell was argumentative with hospital personnel.

Dr. Anthony H. Dekker testified that he is a specialist in child and adolescent behavior and maltreatment in the Pediatric Ecology Unit at Mount Sinai Hospital. Dr. Dekker testified as a treating physician and as an expert. Dr. Dekker testified:

"I asked the child if she knew why she was in the hospital and she admitted that she did know why. And I asked during the history—I was going through her past medical history and got up to the genital examination, I asked if anyone had ever touched her there and she admitted quote, he put his thing in me there, and she was pointing to her vaginal area. She stated that the person was her father and that it led me to believe that there had been penal [sic] vaginal penetration by history."

Dr. Dekker performed a complete head-to-toe examination of L.C. The examination revealed that she had multiple scars on her body consistent with scratches and loop cord beatings which indicated she was hit hard enough to make the skin break. The scars were at least a month old. The scars were consistent with the findings that the child was physically abused.

Dr. Dekker's genital examination revealed that L.C. had marked bruising around the hymenal opening. The covering of the hymen started to ooze blood as soon as Dr. Dekker touched it. He observed hymenal tears in three places around the hymenal opening and a bloody discharge. The hymenal opening was also "considerably large." Dr. Dekker testified that the findings of the examination were "consistent with traumatic penetration of either a penis or large finger causing tears in the hymenal opening." He further testified that the hymen was also "swollen and rounded which was consistent with some recent trauma that would have torn the hymen and broken a lot of that fine paper-thin edge that the hymen normally have [sic] prior to intercourse." Dr. Dekker testified that such injuries would take 5 to 10 minutes to hours to develop, and swelling could last for days. His opinion was that L.C.'s genital injuries occurred within the last four days. Dr. Dekker's ultimate diagnosis was acute sexual assault. Dr. Dekker also testified that Russell was uncooperative and that he smelled alcohol on her breath.

Defense counsel called Bobbie Ann West as a witness. West is defendant's girl friend and has known him for about four years. West testified that shortly after 4 p.m., she saw Russell and her children enter defendant's apartment. West noticed a hole in L.C.'s stockings before L.C. entered the apartment. Ten minutes after their arrival, West and defendant testified that Russell and the children went across the street to a store selling liquor and small items and returned to defend-

ant's apartment carrying a bag. West testified that she entered the apartment five minutes later and heard defendant asking Russell to leave. West saw Russell take a tenth of Crown Royal out of the bag and start drinking it. West did not hear any accusations that defendant had molested anyone. West and defendant both testified that defendant called the police twice. West admitted slapping Russell, and defendant's testimony corroborated this. After that incident, Russell and her children left. One hour elapsed from the time Russell and her children initially arrived until they left.

Defendant testified that he was not expecting Russell and her children. After returning from the store, Russell sat at the bar in defendant's apartment and drank. Defendant did not offer either child a pop and never left the front room while Russell and her children were present. Russell and her children were in the apartment for about 15 minutes before defendant asked her to leave. Shortly after Russell and the children left the apartment, defendant went to the store across the street to buy cigarettes. When he came out of the store, defendant noticed Russell speaking with police. When defendant approached the police, he was arrested. Defendant denied having intercourse with L.C., and denied ever striking or stabbing Russell.

After closing arguments, the trial court found defendant guilty of aggravated criminal sexual assault. Defendant was sentenced to eight years' imprisonment.

On September 26, 1988, defense trial counsel filed a two-page motion for a new trial alleging discovery of new evidence that L.C. had lied about the sexual abuse at Russell's insistence. On October 14, 1988, Irv Miller substituted as defendant's counsel. On November 3, 1988, Miller was given leave to file an extensive amended motion for a new trial.

The amended motion renewed the allegation that new evidence favorable to defendant had come to light. Additionally, the amended motion alleges that defendant was denied his right to a fair trial due to ineffectiveness of his trial counsel based on the fact that trial counsel failed to subpoena relevant documents including Department of Children and Family Services (DCFS) records, juvenile court records, Illinois Bell telephone records, Chicago police department 911 tapes or records of defendant's prior arrests.

Defendant's new counsel obtained some of the above documents and records. The police radio dispatch records indicate that at 6:37 p.m. on July 9, 1987, an individual giving the name "Gunartt" called 911 from a telephone with the number 542-5890 to report a disturbance and ask for police assistance. Illinois Bell records show that the above telephone number is defendant's.

DCFS records indicate that C.C. gave a statement to them regarding the July 9 incident. C.C.'s DCFS statement omits key testimony which he gave at trial. Another DCFS report states that L.C. screamed and Russell found her putting on her clothes. This report could impeach L.C.'s testimony. Yet, another DCFS report indicates that Russell told an interviewer that she was in the apartment drinking beer and watching television but heard nothing. A police report allegedly containing notes of an interview with Russell states that Russell claims that defendant lured L.C. into his bedroom with the promise of money, that Russell heard a scream, went to investigate and found L.C. with her clothes in disarray and her stockings pulled down.

Defendant's criminal record shows that he had three prior arrests and that Russell was the complaining witness on all of them. The three arrests were never prosecuted.

The amended motion also contains affidavits of witnesses. Linda Fitch, who lived on the second floor of defendant's building, executed an affidavit which states that she saw Russell and the children arrive on July 9, 1987. Fitch claims to have seen Russell go to the store across the street and return. Further, Fitch swore that she heard arguing going on in defendant's apartment and saw West arrive. Fitch also heard defendant threaten to call the police.

Alice Grant, West's sister, claims she went to defendant's apartment on July 9, 1987, and observed West requesting that Russell and her children leave. Grant witnessed West slap Russell and, thereafter, saw Russell and her children leave.

George Page lived upstairs of the defendant. Page saw a woman and two children arrive at defendant's apartment on July 9, 1987. Page also saw the woman and children go across the street to the liquor store and return to defendant's apartment. Page heard defendant ask the woman to leave, the woman refuse to do so and defendant threaten to call the police. Page saw West enter the apartment. When the woman (Russell) left, Page heard her say that she was "going to give him so much trouble that he would wish he never had seen her."

At the post-trial hearing, Willie Williams testified that he was defendant's cousin. When he arrived at defendant's apartment on July 9, 1987, West was present and Russell was cursing at the defendant. Russell refused to leave, and shortly thereafter, Williams left.

Walter Bibbs, Russell's father, testified that L.C. told him that defendant did not touch her and that she had lied about the rape. Abby Bibbs, Russell's daughter, also testified that she had a conversation with L.C. in June 1988, regarding the alleged assault. During that conversation, L.C. told her that defendant had not done anything to her and that

she had lied because Russell had told her to do so. Abby testified that in December 1988, she spoke with Russell after she had come from court. Russell was "kind of high" and crying. Abby testified that Russell told her: "Oh, I wish I had not lied on [defendant] because I did not know it was going to go this far." Abby testified that Russell was afraid to stop the lie because she thought that she would go to jail.

Betty Franklin, Russell's aunt, testified that on November 10, 1988, an investigator came to her home. C.C. told the investigator that defendant had not raped his sister. C.C. claimed it was a lie they had to tell because they were scared. L.C. also spoke with the investigator. L.C. said that defendant had not raped her. L.C. stated that Russell told her to go into the bathroom and tear her panties and claim that defendant had attacked her.

At the post-trial hearing L.C. denied speaking with Abby, Franklin or Walter Bibbs about the case. L.C. denied that she said defendant never raped her or that Russell had told her what to say to the police or in court.

Russell took the stand and denied having a conversation with Abby the day defendant was convicted. Russell denied telling Abby that she had lied about defendant. Russell testified that she did not get along with Abby. Russell further claimed that she did not tell L.C. to go into defendant's bathroom and tear her panties and then claim defendant had attacked her. Russell stated that Walter Bibbs told her that he had been promised $1,000 to get L.C. and Russell to "drop the charges." Walter Bibbs offered Russell half of the money if she would comply. Additionally, Russell said that Walter Bibbs threatened to have her children taken away from her if she testified.

C.C. testified that while he was at Franklin's home in November 1988, he was told that a detective wanted to see him. C.C. admitted to saying that defendant had not raped L.C., but that he said this because he was afraid that he would be taken from his mother. C.C. testified that Russell never told him to lie about defendant.

After argument by counsel, the trial court held:

> "Based upon that corroboration [Dr. Dekker's medical testimony], coupled with the testimony of [L.C.], who testified at trial, subjected herself to cross examination and also did so today, and the testimony of [C.C.], her brother, as to what occurred in the apartment that day, I believe her testimony. And I believe it more so when it is viewed in the light of the testimony of the doctor, who indicated that there was trauma, recent trauma to her vagina."

Defendant argues that the trial court erred in denying his motion for a new trial because he was not proved guilty beyond a reasonable

doubt and the additional testimony offered at the post-trial hearing conclusively established that fact. The standard this court must apply is whether after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 53; *People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344.) Once a defendant has been found guilty of the crime charged, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the State. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267; *People v. Daniels* (1987), 164 Ill. App. 3d 1055, 518 N.E.2d 669.) A reviewing court should not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of guilt. *Young*, 128 Ill. 2d at 51, 538 N.E.2d at 472.

■ Where a defendant has been convicted of aggravated criminal sexual abuse, and he denies the charges, the conviction will be upheld where there is some corroboration of the testimony of the complaining witness by some other evidence, fact or circumstance in the case or the testimony of the complaining witness is otherwise clear and convincing. (*Daniels*, 164 Ill. App. 3d at 1073, 518 N.E.2d at 682; *People v. Findlay* (1988), 177 Ill. App. 3d 903, 913, 532 N.E.2d 1035, 1042.) Defendant argues that there were discrepancies in L.C.'s and C.C.'s testimony which presented sufficient doubt. The law, however, is clear that testimony of the complaining witness need not be uncontradicted or unimpeached or crystal clear and perfect in order to be deemed "clear and convincing." (*Daniels*, 164 Ill. App. 3d at 1073, 518 N.E.2d at 682.) If the discrepancies do not detract from the reasonableness of the complainant's story as a whole, it may be found clear and convincing. (*Findlay*, 177 Ill. App. 3d at 911, 532 N.E.2d at 1041.) None of the discrepancies between L.C.'s and C.C.'s testimonies are major and, therefore, do not detract from the reasonableness of L.C.'s testimony. L.C.'s testimony is clear and convincing in and of itself. Additionally, the trial court found that L.C. was a credible witness whose testimony was not only corroborated by C.C.'s testimony, but more importantly by the medical findings of Dr. Dekker. The trial court properly denied defendant's motion for a new trial because L.C.'s testimony was clear and convincing and was further corroborated. See *Daniels*, 164 Ill. App. 3d at 1072, 518 N.E.2d at 682.

Defendant asserts that he was denied a fair trial where the prosecution failed to properly comply with discovery, where a hearsay statement

was improperly admitted at trial and where the prosecutor improperly commented upon the evidence presented at the post-trial hearing.

■ Defendant argues that the State failed to provide defense trial counsel with copies of DCFS reports. This issue has been waived for review purposes because defendant failed to raise the issue at trial. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) The law in Illinois is clear that "[b]oth a trial objection and a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphasis omitted.) *Enoch*, 122 Ill. 2d at 186, 522 N.E.2d at 1130; Ill. Rev. Stat. 1983, ch. 38, par. 116—1.

Defendant argues that he was prejudiced because the State failed to notify defense trial counsel that it planned to introduce L.C.'s statements to Dr. Dekker and the emergency room physician as evidence at trial. Defendant contends that those statements should have rightly been excluded by the hearsay rule. Again, defendant's failure to object to the disputed statements at trial waives the issue for appeal. (*Enoch*, 122 Ill. 2d at 186, 522 N.E.2d at 1130; Ill. Rev. Stat. 1983, ch. 38, par. 116—1.) Although we find that defendant waived his right to have this issued reviewed, we feel compelled to discuss it substantively.

■ There must be an affirmative showing on record that the court actually used improper evidence to rebut the presumption that the trial court considered only competent evidence. (*People v. Shaw* (1981), 98 Ill. App. 3d 682, 424 N.E.2d 834.) There is a presumption that the trial court relied only on proper evidence in reaching a determination on the merits at a bench trial. (*People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649.) The record indicates that the trial court relied upon L.C.'s testimony of the circumstances of the alleged attack, C.C.'s corroborating testimony and upon Dr. Dekker's medical finding that L.C. had experienced recent trauma to her vaginal area. Not only has defendant waived his right of review to the introduction of the complained-of statements, but defendant has also failed to cite any evidence which would overcome the presumption that the trial court relied on proper evidence in reaching its decision.

■ Defendant contends that he was prejudiced by the State's remarks at closing argument during the post-trial hearing. The State has the right to comment on the evidence and reasonable inferences which can be drawn therefrom even if detrimental to the defendant. (*People v. Faysom* (1985), 131 Ill. App. 3d 517, 475 N.E.2d 945.) The State has wide latitude during closing argument, and the trial court's determination regarding the propriety of the argument will not be overturned on appeal absent a clear abuse of discretion. (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; *People v. Barnes* (1983), 117 Ill. App. 3d

965, 453 N.E.2d 1371.) If based upon the evidence or reasonable inferences drawn therefrom, the State may properly comment on the credibility of the witnesses. *People v. Ford* (1983), 113 Ill. App. 3d 659, 447 N.E.2d 564; *People v. Alexander* (1984), 127 Ill. App. 3d 1007, 470 N.E.2d 1071.

Defendant objected to the following comments made by the State:

"I think, what happened since the time of trial, the defendant's family had influenced a number of witnesses to come forward. And I think, your Honor had the opportunity to see the credibility of Walter Bibbs, and heard the testimony of Mrs. Russell, today. That Mr. Bibbs was trying—was offered money and was trying to pay to get other people to change their testimony. I think, a lot happened since the trial. There is a lot of arm twisting and threats and money offered."

This comment was made during closing arguments after the trial court heard all the additional evidence presented at the hearing on defendant's motion for a new trial. During that hearing, Russell testified that Walter Bibbs offered money to her if she "dropped the charges" against defendant and threatened to have her children taken away from her if she testified. We find that the State was merely commenting and drawing reasonable inferences upon the evidence that the trial court heard regarding Walter Bibbs and that, therefore, the State's comments did not prejudice defendant.

Defendant maintains that a number of errors committed by defense trial counsel prohibited him from receiving effective assistance of counsel. The Illinois Supreme Court held that effective assistance of counsel refers to competent, not perfect, representation and that, in the absence of a showing that the outcome of the new trial likely would be different, the Constitution does not require a new trial for every defendant whose counsel errs at trial. (*People v. Stewart* (1984), 104 Ill. 2d 463, 491-92, 473 N.E.2d 1227, 1240; *People v. Greer* (1980), 79 Ill. 2d 103, 121, 402 N.E.2d 203, 212.) Ineffectiveness of counsel is shown where (1) the attorney's representation fell below an objective standard of reasonableness and the shortcomings of counsel were so severe as to deprive defendant of a fair trial, and (2) there is a reasonable probability that, but for the attorney's unprofessional errors, the results of the proceedings would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2064.) This two-prong test was adopted by the Illinois Supreme Court in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246. Defendant bears the burden of proving that counsel's performance was deficient. (*Albanese*, 104 Ill. 2d at 525-27, 473 N.E.2d at 1256.) When reviewing trial coun-

sel's performance, we indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 699, 104 S. Ct. at 2065.

Defendant's trial counsel filed his appearance on July 13, 1987. From that date until trial counsel filed a two-page motion for new trial, he filed no written motions on behalf of defendant. The record is silent as to any pretrial discovery, oral or written, undertaken by trial counsel on behalf of defendant. The morning defendant's bench trial began, the State voluntarily tendered medical summaries to defense trial counsel, who acknowledged that he previously did not have copies. Despite being tendered this new relevant discovery for the first time, defense trial counsel proceeded immediately to trial without requesting a continuance or even a brief recess to examine and evaluate the tendered documents.

Further, had defense trial counsel obtained the medical summaries prior to trial or requested the time to review those records when the State turned them over to him, counsel would have realized that L.C. had been physically abused at least one month before she came into contact with defendant. That information would have led a reasonable attorney to question whether there were any reports of child abuse with the police department or with DCFS. Had defense trial counsel obtained the DCFS reports, he would have discovered that L.C.'s, C.C.'s and Russell's statements regarding the alleged attack differ from the testimony they gave at trial and at the post-trial hearing and that Russell had been investigated for child abuse. Moreover, a reasonable attorney with this knowledge would have subpoenaed Russell to testify at trial. The result of counsel's ineffectiveness was that the trial court did not hear any testimony regarding Russell's long-time difficulties with DCFS for abusing her children.

Defense trial counsel also failed to question L.C. and C.C. in a timely fashion regarding their competency to testify. Even though defense trial counsel made no attempt to question the children during the initial *voir dire* to establish their competency to testify, defense counsel attempted to question L.C. about her brother's age relative to her age on the basis that it went "to the capability of this witness." The trial court sustained an objection to this question because the children's competency to testify had previously been established.

Failure to adequately investigate and develop an available defense has been found to be ineffective assistance of counsel. (*People v. Wright* (1986), 111 Ill. 2d 18, 488 N.E.2d 973.) Failure to present available witnesses to corroborate a defense has also been found to constitute ineffective assistance of counsel. *People v. Solomon* (1987), 158 Ill. App. 3d 432, 511 N.E.2d 875.

Defense counsel failed to obtain available evidence to corroborate defendant's story. Even though defendant claimed to have telephoned the police on the date of the alleged incident, there is no indication that defense trial counsel did even the slightest investigatory work regarding this claim. Defense trial counsel failed to obtain and introduce into evidence police emergency 911 tapes and records that indicate that an individual using the name "Gunartt" telephoned to report a disturbance on the night in question. Now, unfortunately, the 911 tape recording has been destroyed and all that remains is a card which the operator filled out during the call. In fact, defense trial counsel stipulated at trial that the defendant never told the arresting police officer that he had tried to contact the police. Defense trial counsel failed to interview people who were outside the defendant's home on the night in question who allegedly heard defendant asking Russell to leave. Defense counsel also failed to subpoena defendant's criminal record which indicates that Russell was the complainant in each of the three prior arrests and that the State refused to prosecute each one of those arrests. Defense trial counsel also never introduced evidence that defendant had been employed for 19 years by the same company.

Defendant has shown that defense trial counsel's representation fell below an objective standard of reasonableness in a manner which deprived defendant of a fair trial. Defense trial counsel's shortcomings include failure to (1) investigate the case, (2) issue subpoenas for key records such as the DCFS records, the police 911 tapes, telephone records and defendant's criminal record, (3) request pretrial discovery, (4) request a continuance or at least a short recess to review medical documents the State turned over the morning of trial, (5) make any effort to exclude harmful evidence at trial, (6) timely challenge the competency of L.C. and C.C., and (7) to subpoena Russell to testify at trial. We find that there is a reasonable probability that but for defense trial counsel's unprofessional errors, the results of the trial would have been different.

For the reasons set forth above, we find that defendant was denied effective assistance of counsel, and therefore, reverse and remand this matter for a new trial.

Reversed and remanded.

CAMPBELL and O'CONNOR, JJ., concur.