(No. 75247.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES KERWIN, Appellant.

*Opinion filed July 28, 1994.*

438

HARRISON, J., took no part.
McMORROW, J., joined by FREEMAN, J., dissenting.

Daniel M. Kirwan, Deputy Defender, and Janet Gandy Fowler, Assistant Defender, of the Office of the State Appellate Defender, of Mt. Vernon, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen, Assistant Attorney General, of Chicago, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

After a bench trial, defendant James Kerwin was found guilty of three counts of aggravated criminal sexual assault in violation of section 12—14(b)(1) of the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1)). The trial court entered judgment on the first count and sentenced defendant to 15 years' imprisonment. The appellate court affirmed with one justice dissenting. (241 Ill. App. 3d 632.) We granted leave to appeal (134 Ill. 2d R. 315), and now affirm the lower courts.

The facts that gave rise to this cause began with defendant's May 1988 divorce from wife, Rita Emig. Joint custody of their four children was awarded, with defendant getting physical custody of their three sons and Rita getting physical custody of their nine-year-old daughter, L.K. In August 1988, Rita was unable to care for L.K., so L.K. moved in with defendant and her

brothers. Rita then moved to Colorado, and began a lesbian relationship with a woman named Bernie.

Defendant told Rita's parents about Rita's new-found sexual preference. According to defendant, Rita was angry over the disclosure and threatened to get back at defendant by bringing sexual abuse charges against him.

In February 1989, Rita had her mother pick up L.K. and deliver her to Rita instead of returning her to defendant. Rita returned to Colorado with L.K., and filed a report of sexual abuse against defendant with the Department of Children and Family Services (DCFS). After an investigation, DCFS dismissed the allegations as unfounded.

In June 1989, Rita again leveled sexual abuse charges against defendant. Bernie and Rita then took L.K. to Cecilia Rumney, a youth and victims counselor with the Colorado Springs police department. Rumney interviewed L.K. twice, and these interviews were videotaped.

This time, DCFS found the charges substantiated, and this second set of allegations eventually led to this criminal action. The State's Attorney filed an information charging defendant with three counts of aggravated criminal sexual assault. The explicit nature of the abuse is adequately set forth in the appellate court opinion (241 Ill. App. 3d at 633), and we see no need to reiterate the sordid details of the charges.

Defendant pleaded not guilty and waived a jury trial. Prior to trial, defense counsel filed a motion pursuant to section 3 of the Uniform Act to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings (Ill. Rev. Stat. 1989, ch. 38, par. 156—3), asking the trial court to issue an order directing that Rita be taken into immediate custody in Colorado and transported to Illinois to testify at trial. In that motion, defense counsel described Rita as a material witness. At

the hearing on the motion, defense counsel informed the court that he had not yet issued a subpoena for Rita's appearance and did not know where Rita was. The court told defense counsel to call Rita's attorney to get her address, and to issue Rita a subpoena. It indicated that if Rita would not comply with the subpoena, it would issue an order for her arrest. However, defense counsel took no further steps to secure Rita, and Rita did not testify at trial.

The following evidence was adduced at trial. L.K. testified in graphic detail to the nature of the abuse. The abuse began when she was six or seven, and ended shortly before she went to Colorado with Rita. She claimed that defendant threatened to withhold food if she told anybody what he was doing.

L.K. admitted that when she was first asked about whether defendant had abused her, she said that he had not. She testified that she did not tell her mother about the abuse because she was afraid she would not be believed, and that she had initially denied the abuse because she was afraid of defendant.

Cecilia Rumney testified about her two interviews with L.K. Rumney has a bachelor of science degree in psychology and a masters degree in counseling, and has worked with sexually abused children in the past. While Rumney was on the stand, the State moved to introduce the videotapes of her interviews with L.K., but cautioned court and counsel that the second tape contained L.K.'s speculation concerning irrelevant matters, and matters to which she had not testified. The State invited defense counsel's objections and offered to redact the inadmissible portions, but defense counsel declined, saying he preferred the court view the tapes in their entirety.

Kae Ecklebarger also testified for the State. Ecklebarger is a social worker with the El Paso County department of social services. She has a bachelors degree

in social work, and has received over 50 hours of direct training from the National Center for Child Abuse. However, her entire training in post-traumatic stress syndrome is a single one-day seminar, as well as some unspecified training in "the accommodation syndrome."

Without objection, Ecklebarger was permitted to testify that the accommodation syndrome is "a part and parcel of the entire post-traumatic stress syndrome." She further testified that the accommodation syndrome and the post-traumatic stress syndrome were "commonly accepted in her field of expertise." She then opined that at the time of her interviews, L.K. was suffering from post-traumatic stress syndrome related to sexual encounters. She found nothing unusual in L.K.'s original denial of abuse, or her only partial disclosure of the nature of the abuse when she finally came forward.

Dr. Karen Kuper is the pediatrician who physically examined L.K. in February 1989. Kuper testified to the results of the exam, which included damage to L.K.'s hymen. In addition, Kuper testified to contents of conversations she had with Rita on the day of the exam, where Rita told Kuper that she was concerned over L.K.'s grades and L.K.'s claim that she had been sleeping with defendant and that defendant asked her for massages.

Finally, the State called Agent Craig Koehler, who works with the Illinois State Police division of criminal investigation. Koehler investigated the claims of abuse against defendant, and testified to the events in the investigation. Koehler testified that, during the course of the investigation, he interviewed defendant. Defendant, after being read his *Miranda* rights, told Koehler that he masturbated in front of L.K. on several occasions, but only when he thought she was sleeping. Defendant told him he had no problems believing that L.K. had been sexually assaulted, and that he was not upset

by it. Defendant told him it was "possible" that he performed the acts complained of by Rita and L.K.

In his defense, defendant testified that Rita had threatened him with allegations of sexual abuse after he told her parents of her lesbian relationship. He denied that it was possible that he had abused L.K. He explained that his earlier statements were responses to hypothetical questions posed by Koehler, that by so answering he had meant that it was in the realm of possibility, and "that President Reagan could have done it too, same realm of possibility."

Pat Kerwin, defendant's son, testified briefly that his brother Brian had run into L.K. with his bicycle, hitting her directly in the crotch. With this testimony, defense counsel tried to explain the damage to L.K.'s hymen. Defendant's son Steve also testified. He did not think defendant had abused L.K.

Shelly Arnold, Steve's girlfriend, testified that she had never observed anything unusual between L.K. and defendant. Finally, L.K.'s fourth-grade teacher, Ruth Harre, testified that L.K. had acted quite normally, although she had missed several days of school.

The State called Dr. James Monteleone in rebuttal. He testified that L.K. displayed several strongly positive findings for sexual abuse and penetration. These behavioral indicators of L.K.'s abuse were that she did poorly in school, was having emotional problems, and described very intimate sexual activity. He opined that the damage to L.K.'s hymen could not have been caused by a bicycle accident, because "you are asking for damages inside the vagina without any evidence of damage outside—odds of that are almost nil."

The trial court found defendant guilty. In so doing, it made the following statement:

> "There is no way a nine year old girl, girl that age can make up something like that. You know, this Court has

been in court long enough, I am not saying I know every time someone is lieing [*sic*] to the Court, I don't.

But, I am confident in this case that [L.K.] was telling the truth. You cannot, the things that she could testify to are not within the experience of a girl that age, not only just the, the set of acts, but the whole totality of the circumstances. No one comes up with the fact, for instance, that they observe their father masturbating in front of them. It was something that is really not even related to this and yet the father has admitted to having done that when she was in the room, not being aware that she was awake. But, that basically, the whole nature of the case is disgusting. No way a nine year old, eight, nine, ten year old girl is going to come up with that type of evidence unless indeed it happened. There is no way she is going to testify against her father, particularly especially one to whom she had a close relationship with unless it is true, unless there is some strong reason to try to get back for some reason. And there is absolutely no evidence of that."

Defendant was sentenced to 15 years' imprisonment. The appellate court affirmed, one justice dissenting, and this appeal followed.

Defendant makes two arguments to this court: that the trial court erred in assessing L.K.'s credibility by relying on unfounded stereotypes of children, and that he received ineffective assistance of counsel. We take these arguments in turn.

Defendant provides this court with an edited version of the trial court's sentencing statement set forth above. He argues that the trial judge's comments that a nine-year-old girl would not lie about sexual assault demonstrates that he failed to assess L.K.'s individual credibility. Rather, the judge relied upon his own generalizations concerning the veracity of a minor's complaints of sexual abuse, generalizations that were neither tested nor in evidence. Defendant goes on to argue, with authority from the field of psychology, that the stereotypes the judge allegedly subscribed to were

not only untested and not in evidence, but were incorrect.

We disagree that the trial judge failed to individually assess L.K.'s testimony. The statement as set forth *supra* demonstrates that the judge was not articulating his belief that nine-year-olds do not lie about sexual abuse, but that L.K. was not lying about these particular allegations of sexual abuse. Contrary to defendant's assertions, the judge did not claim that a young girl would never testify falsely against her father, but rather rejected the possibility in this case that L.K.'s mother pressured or forced L.K. into making false accusations against the defendant, or that L.K. had been abused by someone other than her father.

Admittedly, the trial court made some extraneous remarks regarding nine-year-old girls' sexual knowledge in general. Taken in the context in which those remarks were made, however, we do not find that the trial court failed to properly assess L.K.'s credibility. The trial judge clearly stated, "I am confident in this case [L.K.] was telling the truth."

It is the duty of the trier of fact to assess the credibility of the witnesses, and a reviewing court has neither the duty nor the privilege to substitute its judgment for that of the trier of fact. (*People v. Novotny* (1968), 41 Ill. 2d 401.) The judge was "convinced that the act of digital penetration, the act of penile penetration and the act of touching with the tongue did in fact occur within the period of time that the witness described." We therefore reject defendant's first argument.

Defendant's second argument is that he received ineffective assistance of counsel.

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance

was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064. See also *People v. Albanese* (1984), 104 Ill. 2d 504, 525.) Judicial scrutiny of counsel's performance must be highly deferential. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065; *Albanese*, 104 Ill. 2d at 525.

Defense counsel's performance was certainly questionable; the trial judge himself stated that he "felt uncomfortable with some of the strategy used." Kae Ecklebarger's qualifications as an expert are dubious, as were her conclusions. Both Dr. Kuper and Cecilia Rumney were allowed to testify to hearsay conversations that they had with Rita, which were outside the ambit of section 115—10(a)(2) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(a)(2)), since they were comments made by Rita, and not the child abused. The strategy behind defense counsel's decision not to have the State redact irrelevant and scandalous portions of the videotape escapes the members of this court. And defense counsel failed to call Rita, whom he himself described as "a material witness."

Nevertheless, we are unable to find that defendant has shown prejudice as required under *Strickland* and *Albanese*. The trial court's decision was based primarily on L.K.'s testimony, during which none of the more questionable "strategies" were employed by defense counsel. Through Agent Koehler, the State showed defendant's admissions that the events could "possibly"

have happened. And through Drs. Kuper and Monteleone, the State showed through physical evidence that L.K. had been abused.

Further, while defendant has complained to this court that Ecklebarger's credentials are dubious and her opinion suspect, he has not offered anything such as his own expert to contradict Ecklebarger's testimony. While he complains that Rita should have been subpoenaed by defense counsel, he has offered nothing to indicate what Rita might have said.

Keeping in mind that the defendant has the burden of establishing both *Strickland* requirements, we hold that defendant has not met his burden. The testimonies of L.K., Agent Koehler, Dr. Monteleone, and the proper testimony of Dr. Kuper overwhelmingly inculpated defendant. Removing the questionable portions of the trial would not have changed the decision. Thus, the defendant was not prejudiced. Moreover, we note that this was a bench trial, and not a trial by jury. There is a presumption that a trial judge will consider only relevant, competent testimony. (*People v. Bey* (1972), 51 Ill. 2d 262, 267.) Thus, to the extent that irrelevant or incompetent evidence was inappropriately received, we presume that the trial judge disregarded it. Since no prejudice has been established, defendant's claim of ineffective assistance of counsel falls.

Accordingly, we affirm the judgments of the trial and appellate courts.

*Judgments affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.

JUSTICE McMORROW, dissenting:

I dissent because I believe defendant has established that he was denied fundamental due process of law. I would reverse for two reasons: the record indicates that

defense counsel's representation of defendant did not meet an objective standard of reasonableness, resulting in prejudice to defendant; I also dissent because the record reflects that the trial judge relied on his personal beliefs, which had no basis in the evidence, in assessing the credibility of L.K., the victim of the alleged abuse in this case. For these reasons, I would reverse and remand for a new trial.

I

To prove ineffective assistance of counsel, a defendant must establish the two-part showing set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. The record must indicate that defense counsel's performance was so deficient as to fall below an objective standard of reasonableness, depriving defendant of a fair trial; defendant must also demonstrate that there is a reasonable probability that but for his counsel's deficient performance, the outcome of the trial would have been different. In *People v. Davis* (1990), 203 Ill. App. 3d 129, 141, "reasonable probability" was defined as "probability sufficient to undermine confidence in the outcome." (Accord *People v. Albanese* (1984), 104 Ill. 2d 504.) Under the facts in this case, there is a reasonable probability that defense counsel's inadequate performance materially affected the outcome of the case.

With respect to defense counsel's performance in the instant case, the trial judge stated that he " 'felt uncomfortable with some of the strategy used.' " The majority of this court states, "Defense counsel's performance was certainly questionable." (159 Ill. 2d at 445.) However, the majority concludes that defendant was not prejudiced by his counsel's performance because his counsel's "strategies" did not affect the judge's decision, which was "based primarily on L.K.'s testimony." 159 Ill. 2d at 445.

My conclusion that defendant, in the case at bar,

was deprived of the effective assistance of counsel is based on the following: defense counsel failed to raise a speedy-trial issue, defense counsel failed to challenge the foundation of expert opinion, defense counsel failed to challenge videotaped hearsay evidence, and defense counsel failed to adequately investigate and prepare for trial. This dissent treats those issues in the stated order.

Defendant was arrested on August 4, 1989, and charged by information with a single count of aggravated criminal sexual assault. He was unable to post bond and remained in custody throughout the pretrial period. Consequently, defendant had a statutory speedy-trial right to be tried within 120 days, unless he caused or contributed to delays in trial. (Ill. Rev. Stat. 1991, ch. 38, par. 103—5(a); *People v. Morris* (1954), 3 Ill. 2d 437.) Defendant's attorney requested one continuance. The trial began on December 12, 1989, which was within the 120-day speedy-trial period because of the continuance. However, defense counsel did not object to the filing of two additional felony counts that the State added to the information *on the day of trial.* Under Illinois precedent, the two late-added counts were vulnerable to a challenge based on the running of the speedy-trial period. The defendant's agreement to a continuance of trial on the original charge does not extend to additional counts that are added after the date of the continuance. In *People v. Alcazar* (1988), 173 Ill. App. 3d 344, defendant's conviction was reversed upon a finding that defense counsel was ineffective for failing to make a speedy-trial challenge to the late-filed charge. (Accord *People v. Hawkins* (1991), 212 Ill. App. 3d 973.) Based on these authorities, defense counsel should have objected to the State's filing of the two additional felony charges on the day of trial; the trial court likely would have dismissed those charges as violative of defendant's right to speedy trial under section 103—5(a).

Kae Ecklebarger, a social worker with the El Paso department of social services, testified in the State's case in chief. In Ecklebarger's opinion, L.K.'s reactions and behavior fit within an undefined "accommodation syndrome," which she considered integral to the "post-traumatic stress syndrome." Ecklebarger's opinion was that L.K. suffered several symptoms of post-traumatic stress syndrome caused by sexual assault. These symptoms included a pattern of delayed disclosure of the sexual abuses and "disassociation" from negative experiences similar to a mental state "first noted with Viet Nam vets." Ecklebarger's expertise was based on a one-day seminar dealing with post-traumatic stress syndrome, which she attended *after* her participation in the interviews of L.K.

Defense counsel did not move to disqualify Ecklebarger as an expert witness. He did not cross-examine her regarding her stated qualifications to render an opinion on the post-traumatic stress syndrome or accommodation syndrome. Instead, defense counsel elicited additional details of L.K.'s behavior from which Ecklebarger inferred in her testimony that L.K. had been sexually assaulted. Under cross-examination Ecklebarger stated that she had spoken with L.K.'s mother, Rita, and Rita's companion, Bernie, on several occasions about their concern that L.K. was exhibiting what they felt was "provocative" behavior.

Following this line of questioning, defendant's counsel elicited an admission from Ecklebarger that high levels of stress in a child might have causes other than sexual abuse, but Ecklebarger stated that "sexual behavior [in a child] is not generally seen due to physical abuse or neglect." The implication of this opinion was that the psychological stress and the behaviors L.K. was exhibiting were caused by her father's sexual abuse rather than other factors, such as physical harm or ne-

glect by the mother. However, the example Ecklebarger cited of L.K.'s supposedly sexualized behavior consisted of L.K.'s walking into the bathroom or bedroom to look while her mother or Bernie showered or changed clothes. Whether such behavior could have been normal curiosity of a child rather than something more sinister was not questioned by defense counsel.

It should be noted that a written report in the record reveals that L.K. had been removed from her mother's home in August 1989. Other references in the transcript suggest that Rita had been charged with physically abusing L.K. At the time of trial, L.K. was in foster care and undergoing therapy.

The record indicates that L.K. had endured, in a period of a few months, the hostile divorce of her parents; her mother's failure to take L.K. with her when her mother went to Colorado to live with Bernie; the move from a house she had lived in all or most of her life to a trailer shared with her father and three brothers; the move out to Colorado; and pervasive and repeated interrogation by several people about her father's sexual abuse of her. In light of these factors, the issue of L.K.'s distress and behavioral disorders arguably should have been subjected to scrutiny by defense-retained experts.

Unlike the majority, I cannot presume that the trial court was not affected by the unchallenged opinion of Ecklebarger, the State's expert witness. Nor can I discard the significance of Ecklebarger's testimony with respect to the issue of defendant's right to effective assistance of counsel. Defense counsel did not challenge Eckelbarger's qualifications to render an opinion regarding "syndrome" evidence, nor did he secure an expert in child psychology to assist the defense. As one court has noted, cases involving sexual abuse against children raise particular difficulties and "[c]onsequently, prior to admission, expert testimony must be tested and

shown to be beneficial to the trier of fact with a minimum of prejudice to the defendant." (*People v. Server* (1986), 148 Ill. App. 3d 888, 898.) The party who offers a witness as an expert bears the burden of establishing his or her qualifications (*People v. Park* (1978), 72 Ill. 2d 203) and "[t]he degree and manner of knowledge and experience required of an expert is directly related to the complexity of the subject matter and the corresponding likelihood of error by one insufficiently familiar therewith" (*Server*, 148 Ill. App. 3d at 899, citing *Park*, 72 Ill. 2d at 209-10).

I do not believe that the State established a proper foundation for its expert's opinion. (*Cf. People v. Pollard* (1992), 225 Ill. App. 3d 970, 976-77 (holding that proper foundation existed for qualified expert's testimony regarding "child sexual abuse accommodation syndrome" where expert had extensive training and experience with sexually abused children, expert testified regarding the characteristics of the syndrome and its recognition by specific agencies, and defense counsel rigorously cross-examined witness concerning the basis of her knowledge of the victim's conduct).) In the instant case, defense counsel did not adequately challenge Ecklebarger's qualifications or the bases for Ecklebarger's opinion. Instead, he elicited from Ecklebarger prejudicial hearsay statements, attributed to Rita and Bernie, from which Ecklebarger concluded, without explanation, that L.K. was exhibiting sexually provocative behavior characteristic of abuse.

The prejudice to defendant was exacerbated in this case when the State's rebuttal witness, Dr. Monteleone, gave additional opinion evidence. Monteleone, a pediatrician, examined L.K. in October 1989, approximately eight months after she had left her father's home and two months after she left her mother's home. Monteleone testified that in his opinion there were strong phys-

ical indicators that L.K. had been sexually abused and penetrated. The State called Monteleone to rebut defense evidence that damage to L.K.'s hymen might have been caused from an injury she had sustained in a bicycle accident. On direct examination, Monteleone discredited the bicycle theory as the cause of damage to L.K.'s hymen.

During cross-examination, defense counsel asked Monteleone a series of questions involving Monteleone's reliance on "behavioral indicators" to support his conclusion of sexual abuse. The State objected to Monteleone's rendering an opinion on behavioral indicators on the ground he had not been qualified as an expert to give such an opinion. The court overruled the objection. Monteleone testified that his knowledge of the behavioral indicators, which he admitted he "got from the report" (unidentified in the record), included L.K.'s poor performance in school, emotional problems, and the ability to describe very intimate sexual activity.

This testimony, which can only be viewed as damaging to the defendant, was elicited by his own counsel. Defense counsel's purpose may have been to ascertain whether the witness would alter his opinion if he knew that L.K.'s behavior appeared normal at the time she left her father in February 1989. Testimony from L.K.'s fourth grade teacher indicated that just before L.K. left Illinois to live in Colorado she was maintaining good grades and was a "very enthusiastic child, *** talkative, kind, sharing." Monteleone responded to defense counsel's inquiry by stating that it was not possible to "time trauma or reaction to a trauma by how they are behaving at the time."

Monteleone's opinion regarding L.K.'s "posttraumatic" behavior appears to be based in large part on the unexamined, hearsay reports of unidentified third parties; moreover, this opinion was elicited by

defense counsel. Like the opinion of Ecklebarger, the opinion of Monteleone appears to rest on a questionable foundation. In this instance, defense counsel's "strategy"—to elicit a favorable opinion from the *State's* witness—backfired. Again, defendant was prejudiced by his counsel's failure to secure expert assistance in the preparation of his case.

Without objection from defense counsel, the State presented in court two lengthy videotapes of L.K.'s interviews in Colorado. For the reasons that follow, I believe the admission of the tapes into evidence constituted another instance of counsel's ineffective assistance which resulted in prejudicial error.

Cecilia Rumney, a youth and victim's counselor employed by the Colorado Springs police department, interviewed L.K. on June 7, 1989, and again on July 13, 1989, in videotaped sessions. Rumney's testimony at trial was offered primarily to lay the foundation for the admission of the videotapes by authenticating them and describing the procedures used by her department in interviewing possible victims of sexual abuse. The State moved for the admission of the videotapes pursuant to section 115—10 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10), a hearsay exception that allows persons to whom the child victim of sexual abuse has reported the abuse to testify at trial. This provision requires the trial court to make a threshold reliability determination by considering, at a hearing outside the jury's presence, the "time, content, and circumstances" under which the statement was made. However, it has been held reversible error to permit witnesses to whom the child complained to testify in extensive detail concerning the descriptions of the acts and conversations with the victims. *E.g., People v. Holveck* (1990), 141 Ill. 2d 84, 103-04.

In the instant case, Rumney's testimony that L.K.

reported instances of sexual contact and penetration was properly admitted at trial as corroboration that L.K. had reported the abuse. However, there appears to be no justification for supplementing Rumney's and L.K.'s trial testimony with the entirety of the videotaped interviews. Section 115—10 does not authorize the admission at trial of videotaped investigation or interviews conducted by law enforcement or child advocacy departments. The videotapes do not lose their character as hearsay by operation of section 115—10. The State offered the tapes, which clearly constitute out-of-court statements intended to prove the truth of the matter asserted, and defendant was not able to cross-examine the declarant or object to the sometimes leading nature of the questions. See *People v. Mitchell* (1992), 225 Ill. App. 3d 708, 716-19; see also *People v. Velasco* (1991), 216 Ill. App. 3d 578, 583-85 (rejecting State's attempts to justify its use of videotaped interview of victim at trial).

This court has held unconstitutional a separate statutory procedure, a "child shield law" which expressly permitted the use of videotaped evidence of child sexual abuse, under more stringent safeguards than present in connection with the videotapes in the instant case. In *People v. Bastien* (1989), 129 Ill. 2d 64, this court held that section 106A—2 of the Code of Criminal Procedure was constitutionally infirm because it authorized the videotaping of the child sexual abuse victim's oral statement or testimony but prohibited contemporaneous cross-examination (although defense counsel was permitted to make objections) and infringed on the accused's right of confrontation. See also *People v. Fitzpatrick* (1994), 158 Ill. 2d 360, in which this court recently held unconstitutional another child shield law, section 106B—1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1991, ch. 38, par. 106B—1). In *Fitzpatrick*, we held that the use of a closed circuit televised proceeding, in

which the child's testimony would be taken outside the presence of the defendant, violated the accused's right of confrontation under the Illinois Constitution, which expressly entitles the defendant to meet the witness "face to face."

*Bastien* and *Fitzpatrick* suggest that the State's use of L.K.'s videotaped interviews in the instant case was improper and prejudicial to defendant. L.K. testified in court regarding the abuse and Rumney testified that L.K. reported such abuse to her. By also submitting the videotaped sessions *in toto*, the State enjoyed the advantage of having L.K. "testify" twice; once in the courtroom, under oath and subject to contemporaneous cross-examination, and then again in the form of the lengthy, open-ended format of the Colorado Springs police department's interviews. L.K.'s unsworn statements in the interview were the product of sometimes leading questions, which were not subject to objection or contemporaneous cross-examination. The videotapes added nothing of substance to the trial testimony, but injected a layer of cumulative and repetitive details that were not elicited in accordance with courtroom procedure. Defense counsel should have challenged their use at trial.

There were other significant shortcomings in defense counsel's representation of defendant. In a pretrial motion defense counsel moved the court to issue an order for L.K.'s mother, Rita Emig, to be taken into custody in Colorado and delivered to Illinois as a material witness for the trial on December 12. The judge suggested defense counsel first try to contact Rita's lawyer informally, to seek her voluntary appearance, but the court also assured counsel he would issue the order if Rita refused to appear. Inexplicably, defense counsel never sought the entry of such order.

As noted, Kae Ecklebarger, the State's expert

witness, based her opinion in part on Rita's hearsay statements concerning L.K.'s behavior. Defense counsel did not move to suppress Rita's hearsay statements or otherwise object to their use against his client.

Finally, the record contains defendant's handwritten letter to the clerk of the court following his conviction, in which he set forth specific reasons he believed his attorney had failed to adequately represent him. In this letter, defendant listed the following witnesses he believed should have been called to testify: his sister-in-law; two counselors from the "Community Resource Center"; one from Kaskaskia college; a social worker from Children's Hospital in St. Louis; and George Zollner, from the Illinois DCFS, who had interviewed defendant in connection with the initial charges of sexual abuse that defendant's ex-wife, Rita, instituted against defendant (the initial complaint was determined to be unfounded). Further, defendant's letter claims that he did not see all of the videotaped evidence until the day of trial and that his lawyer should have filed a motion to suppress. Other points listed in defendant's letter suggest a concern that his counsel "had not handled this type of case before" and "didn't get help" and that his counsel did not know who the State's witnesses were.

In support of its holding, the majority focuses exclusively on the evidence of defendant's guilt, rather than on the showing that trial counsel's ineptness prevented defendant from receiving a fair trial. In so doing, the majority finds that selected portions of the evidence "overwhelmingly inculpated defendant." (159 Ill. 2d at 446.) I disagree that the evidence presented in this case was overwhelming and I believe that the majority's focus on selected portions of the evidence is too narrow. (See *People v. Dillard* (1990), 204 Ill. App. 3d 7, 10 (whether defense counsel's failure to investigate is

ineffective assistance depends on the value of the evi-
dence that was not presented and the closeness of the
evidence that was); *People v. Garza* (1989), 180 Ill. App.
3d 263 (granting new trial where evidence was closely
balanced and defense counsel failed to present alibi
witnesses and to elicit inconsistencies in the testimony
of the State's sole eyewitness who linked defendant to
the crime).) We cannot be certain that the result would
not have been different if defendant's trial counsel had
fully investigated the facts, obtained the assistance of
experts, and presented material witnesses. Therefore,
under established Illinois law, defendant is entitled to a
new trial because the State's evidence was not subjected
to meaningful testing. *People v. Gunartt* (1991), 218 Ill.
App. 3d 752 (reversing conviction on grounds of ineffec-
tive assistance where counsel failed to obtain material
evidence, failed to request a continuance to review key
medical records tendered by the State on the day of
trial, and failed to move for the exclusion of harmful ev-
idence or to challenge the competency of the minor
victim and her brother); *People v. Corder* (1982), 103 Ill.
App. 3d 434 (counsel's failure to interview witnesses
and present evidence required new trial); *People v. Bald-
win* (1989), 185 Ill. App. 3d 1079 (defense counsel's fail-
ure to investigate possible defense of insanity by
reviewing psychiatric records required new trial).

In *People v. Bell* (1987), 152 Ill. App. 3d 1007, the
court reversed the defendant's double-murder conviction
and remanded for a new trial because of the cumulative
impact of defense counsel's failings. Defense counsel's
deficiencies included counsel's failure to move for the
suppression of the defendant's confession on grounds of
involuntariness, failure to object to the introduction of
certain evidence, and failure to investigate or call
witnesses who could testify regarding the victim's
propensity for violence and aggression toward the de-

fendant. Defense counsel testified at a post-trial hearing that he did not call witnesses who had knowledge of the victim's violent history because of counsel's belief that their testimony would have conflicted with defendant's theory of self-defense. The court rejected counsel's trial strategy explanation and observed that defense counsel could not evaluate the worth of the witnesses' testimony without thoroughly interviewing all of the potential witnesses about the events leading up to the murders.

In the instant case, defense counsel could not have properly assessed his client's defense without investigating the role of Rita and Bernie in influencing L.K.'s statements to the authorities in Colorado. A thorough investigation of the charges would entail an independent analysis of the two previous investigations and interviews of potential defense witnesses, including experts.

The United State Supreme Court has observed, "In an adversary system of criminal justice, there is no right more essential than the right to the assistance of counsel." (*Lakeside v. Oregon* (1978), 435 U.S. 333, 341, 55 L. Ed. 2d 319, 326, 98 S. Ct. 1091, 1096. See also *People v. Lee* (1989), 185 Ill. App. 3d 420 (reviewing history of sixth amendment right).) In *Lee*, the appellate court reversed the defendant's conviction of murder based on arson and remanded the case for a new trial because defense counsel failed to render effective assistance at trial. The court quoted from a law review article written by Justice Bazelon:

" 'In warning that the sixth amendment guarantee of effective assistance of counsel is in danger of becoming a dead letter in the courts of our major urban jurisdictions, I have concentrated on the problem at the trial level, but the appellate courts must share the responsibility. One of the major reasons that the problem of ineffective assistance has remained hidden is the appellate court's remarkable propensity to ignore the issue of ineffective

assistance of counsel altogether and to paper over the cracks in the house that *Gideon* built.' 42 [U.] Cin. L. Rev. [1,] 20-21 [1973]." *Lee,* 185 Ill. App. 3d at 448.

## II

Notwithstanding the errors of counsel, the majority upholds the trial court's conviction, on the speculative ground that "[r]emoving the questionable portions of the trial would not have changed the decision. Thus, the defendant was not prejudiced. *** There is a presumption that a trial judge will consider only relevant, competent evidence. [Citation.] Thus, to the extent that irrelevant or incompetent evidence was inappropriately received, we presume that the trial judge disregarded it." 159 Ill. 2d at 446.

The presumption that the trial judge in this case only considered proper evidence is rebutted by the judge's express comments, repeated by him at least three times, that L.K. could not have made up any part of her testimony regarding the sexual abuse because nine-year-old girls do not know of such matters. (See *People v. Gilbert* (1977), 68 Ill. 2d 252, 258-59.) The judge's confidence that L.K. was telling the truth was based on his belief that there "is no way" girls of her age could "come up with that type of evidence unless indeed it happened." Personal assumptions regarding children's veracity, experience, and psychology—no matter how sincerely held—cannot substitute in a court of law for testimony subject to the rules of evidence and other procedural safeguards. Reviewing courts have a duty to ensure that the trial judge's rulings are not tainted by reliance on untrustworthy evidence or personal beliefs. *E.g., People v. Alford* (1982), 111 Ill. App. 3d 741 (reversing where court's comments indicated it considered incompetent evidence); *People v. Bolyard* (1975), 61 Ill. 2d 583 (reversing for new sentencing hearing because of the court's statements that sexual

abuse of a child was the most sinful and reprehensible of crimes).

A Michigan appellate court noted, in a case involving repeat criminal offenders:

"The trial judge's conclusion seems to be based on his own unsubstantiated personal view of a highly complex aspect of human psychology. The trial judge has simply concluded that an older person is more likely to be a repeat offender than a younger person. Before a sentencing judge can make such a conclusion, some scientific or psychological justification should be made part of the record and the defendant must be afforded the opportunity to challenge the court's belief ***." *People v. McKernan* (1990), 185 Mich. App. 780, 782-83, 462 N.W.2d 843, 844.

In the instant case, the trial judge apparently was influenced by his personal view of a highly complex aspect of human psychology. The record does not support a conclusion that children of L.K.'s age lack knowledge of sexual matters.

The central issue in this case is whether defendant had effective legal assistance in challenging the State's evidence and whether the trial judge relied on improper matters—either his own biases or incompetent evidence. I believe it is incumbent upon this court to acknowledge the significance of competent expert opinion, or the lack thereof, in trials involving sexual abuse of children.

On the critical issue of L.K.'s truthfulness and credibility, the trial court proclaimed that there was "no way" L.K. would testify against her father if the charges were untrue, "unless there was some reason. And there is *absolutely no evidence* of that." (Emphasis added.) Contrary to the judge's unequivocal statement, the record reflects a powerful motive, on the part of Rita, that could have led to L.K.'s fabrication or exaggeration of her accusations. Although the trial judge was free to believe L.K. and disbelieve defendant, the judge did not state that he was making a credibility determination as to defendant's evidence of motive.

Instead, the judge denied the existence of *any* evidence of record to suggest a reason to fabricate.

However, in May 1988, after an 18-year marriage, the parties divorced and Rita told defendant she was involved in a lesbian relationship with Bernie. Subsequently, Rita moved to Colorado to live with Bernie. Defendant, whose employment and income was limited, moved with the children from the family home to a trailer. Defendant and the three sons slept in the two bedrooms and L.K. slept on a couch in the living room. Although Rita was to take physical custody of L.K. in the summer of 1988, she did not do so and defendant enrolled L.K. in school.

According to defendant, Rita's mother invited defendant and the children to her home for Christmas in 1988. While there, defendant disclosed his ex-wife's living arrangements. In February 1989, when Rita learned that defendant had told her mother about her lesbian relationship, Rita threatened to "get even" with defendant and to "make him look bad" by accusing him of molesting their daughter. Shortly thereafter, Rita took L.K. to Colorado and initiated the first investigation into defendant's alleged sexual misconduct. At about the same time, defendant filed for custody of L.K., in Illinois.

In response to Rita's allegations, defendant was questioned by George Zollner, an investigator with the Illinois DCFS, and a police officer. According to defendant, Zollner asked him to take a lie detector test, which he took and passed. In Colorado, L.K. was examined by Dr. Kuper, who found physical evidence consistent with, but not conclusive of, sexual abuse. However, L.K. denied that her father had sexually abused her. Authorities notified defendant that the charges against him were considered "unfounded."

The second investigation began a few months later,

when Rita again notified authorities in Colorado and Illinois of L.K.'s accusations. During the time period between the two investigations, L.K. remained in Colorado with Rita and Bernie. As previously noted, the videotaped interviews that were part of this second investigation were admitted into evidence against defendant at his trial. The second videotape, in particular, suggests that L.K. might have been influenced at that time by Bernie, with whom she spoke about the abuse on a frequent basis and with whom she "joked" about the possibility of revenging herself on her father.

Although the trial judge determined that L.K. was truthful and credible at trial, the ultimate issue before this court is whether the judge's conclusion was tainted by either his unsubstantiated personal beliefs or his reliance on incompetent evidence, caused in part by defense counsel's inadequate performance. I cannot conclude, based on my review of the record, that the trial judge's assessment of L.K.'s testimony was unaffected by personal views, the videotapes, and the untested opinion of Eckelbarger and Monteleone. Therefore, I cannot concur in the majority's holding that the trial court presumably considered only the "competent" portions of the evidence. I also depart from the majority's stated belief that the trial judge's ruling was unaffected by trial counsel's performance. In this case there was a near-total failure of the fundamental purpose of trial, which is to seek the truth of what happened within the framework of procedural due process.

JUSTICE FREEMAN joins in this dissent.